Leo **KENNERLY, Sr., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

No. CV–81–3–GF.

United States District Court,
D. Montana,
Great Falls Division.

Feb. 10, 1982.

Steven L. Bunch, Montana Legal Services Ass'n, Helena, Mont., for plaintiffs.

Phil Roy, Browning, Mont., Robert T. O'Leary, U. S. Atty., Billings, Mont., Jeanne S. Whiteing, Kurt V. Blue Dog, Richard B. Collins, Native American Rights Fund, Boulder, Colo., for defendants.

## MEMORANDUM

HATFIELD, District Judge.

Plaintiff,[1] Leo Kennerly, Sr., filed a complaint commencing this action in federal district court on January 9, 1981, alleging jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343(4), 1353, 1361, and 25 U.S.C. § 345. Plaintiff exhausted all administrative remedies prior to filing the complaint. Hence, this court is authorized to judicially review the decision of the Interior Board of Indian Appeals [hereinafter "IBIA"], which spawned the pending litigation, pursuant to 28 U.S.C. § 1331(a). *Andrus v. Charleston Stone Prods. Co.*, 436 U.S. 604, 607 n.6, 98 S.Ct. 2002, 2004 n.6, 56 L.Ed.2d 570 (1978).[2]

The United States, together with the Secretary of the Interior[3] and the present and former superintendents of the Blackfeet Agency [hereinafter "federal defendants"], have filed a motion for partial summary judgment. The Blackfeet Tribe and the members of the Blackfeet Tribal Credit Committee [hereinafter "tribal defendants"], have filed a motion to dismiss.[4] All briefs have been submitted and reviewed, and oral argument was held on December 18, 1981. Accordingly, the matter is now ripe for disposition.

After due consideration, this court has concluded that the decision of the IBIA passes muster under judicial review, and that jurisdiction is lacking for the court to grant the plaintiff's claims for equitable relief and money damages against the tribal defendants. Therefore, the court holds that the motion for partial summary judgment, filed by the federal defendants, and the motion to dismiss, filed by the tribal defendants, are hereby granted.[5]

## I. STATEMENT OF FACTS

At the time of his death, the plaintiff was an enrolled member of the Blackfeet Tribe

1. During oral argument, the court was informed that the plaintiff, Leo Kennerly, Sr., recently had died. Counsel for the plaintiff further informed the court that attempts were being made to substitute the decedent's son, Leo Kennerly, Jr., as the plaintiff in this action. At this writing, the court has not received any notification that such a substitution has taken place. For the sake of clarity, the term "plaintiff" in this memorandum shall be used in reference to the original and now deceased plaintiff, Leo Kennerly, Sr.

2. In *Andrus v. Charleston Stone Prods. Co.*, supra, the United States Supreme Court held that jurisdiction to review administrative decisions rendered by the Secretary of the Interior is conferred on the federal district courts by 28 U.S.C. § 1331(a), and not by the Administrative Procedure Act. Here, the IBIA was acting under the auspices of the Secretary of the Interior when it handed down its decision. 43 C.F.R. § 4.1. *See generally Doria Mining & Engineering Corp. v. Morton*, 608 F.2d 1255, 1257 (9th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 237 (1980).

3. James G. Watt is the present Secretary of the Interior, and is substituted as a party in place of Cecil Andrus, pursuant to Rule 25(d), Fed.R. Civ.P.

4. The partial summary judgment motion filed by the federal defendants is "partial" in the sense that its disposition will affect only the federal defendants.

The motion to dismiss filed by the tribal defendants is in actuality a motion for summary judgment under Rule 56, Fed.R.Civ.P., and will be treated as such accordingly. *See* Rule 12(b), Fed.R.Civ.P. For the sake of clarity, however, the court will continue to refer to the tribal defendants' motion as a motion to dismiss.

5. Plaintiff filed this lawsuit as a class action. Upon receipt of the present motions, the court stayed discovery on the class action issue pend-

of the Blackfeet Indian Reservation. Plaintiff owned interests in parcels of land pursuant to the General Allotment Act, 25 U.S.C. §§ 331, et seq., and the Blackfeet Allotment Act, Act of June 30, 1919, c.4, § 10, 41 Stat. 16, as amended by Act of June 4, 1953, c.99, § 1, 67 Stat. 42. These lands were leased on behalf of the plaintiff by the Bureau of Indian Affairs [hereinafter "B.I.A."]. The income generated by the leases was collected and held for the plaintiff in an Individual Indian Money Account [hereinafter "I.I.M. Account"] administered by the B.I.A. As an allottee, the plaintiff was eligible to apply for and receive the money in his I.I.M. Account.

The Blackfeet Tribe has a loan fund from which members may borrow money from the tribe. Between 1943 and 1957, the plaintiff received several loans for varying amounts from the Blackfeet Tribe. Some of the loans were secured, others were not.

On February 1, 1944, the plaintiff executed an assignment of income and power of attorney from his I.I.M. Account at the Blackfeet Agency to the Blackfeet Tribe, in the amount of $200.[6] On July 7, 1947, the plaintiff executed an assignment of income to the Blackfeet Tribe in the amount of $105.50; a $3,300 assignment was made by the plaintiff on September 22, 1949, followed by a $100 assignment on March 13, 1950.[7]

ing the disposition of the motions. Since the court has granted the motion for partial summary judgment and the motion to dismiss, no further consideration need be given to the class action phase of this litigation.

**6.** The assignment executed on February 1, 1944 states:

### ASSIGNMENT OF INCOME

As security for the performance of any loan agreement resulting form [sic] its application date Feb. 1, 1944, the undersigned hereby assigns to the Blackfeet Tribe of the Blackfeet Indian Reservation of Browning, Montana, all income from any source in which it now has or may in the future acquire an interest, including lease and oil payments.

I or we, the undersigned, agree and authorize the Superintendent of the Blackfeet Indian Reservation to draw to the Treasurer of the Blackfeet Tribe all income which is now or may in the future be accrued to my Individual Indian Account.

This agreement shall apply to all cases of delinquencies.

/s/ Leo M. Kennerly

**7.** The assignments executed on July 7, 1947, September 22, 1949, and March 13, 1950 are identical, and provide for approval by the Agency. Thus, the July 7, 1947 assignment of income reads:

ASSIGNMENT OF INCOME DEPOSITED TO INDIVIDUAL INDIAN ACCOUNT AT BLACKFEET INDIAN AGENCY, BROWNING, MONT.

In consideration of the granting of a Tribal loan to the undersigned, for Refund on U.S. Tr. check 13821 in the amount of $105.50 dated July 7th, 1947 the undersigned, pledges as security, all income deposited to (his) (her) (our) individual Indian Account at the Blackfeet Agency Office, and when notified in writing by the Treasurer of the Blackfeet Tribe, that under

the terms of the above loan, the said loan, or payments of the reunder [sic], are due and payable, I (we) hereby authorize the Superintendent of the Blackfeet Agency, Browning, Montana, to draw check or checks from my (our) Individual Indian Account in payment of such amounts as are due and payable, as reported in writing to the Superintendent by the Treasurer of the Blackfeet Tribe, to me (us) acknowledging receipt of such payment or payments shall be issued a tribal receipt. This assignment of income to cover payment or payments of the above tribal loan, is made with the understanding that it does not take priority over any claims of amounts (I) (we) may owe under the Revolving Credit loans, leases, permits, etc. on tribal land, approved by the Superintendent, or claims of the United States to apply on Reimbursable or other debts payable to the United States, whether past, present, or future, in nature, and such payments thereof are not in conflict with any Department of the Interior regulations, in force at the present time or issued in the future, and further that this assignment is approved by the Sup't. under such rules as he may require.

Leo M. Kennerly

Subscribed and sworn to before me this 7th day of July 1947.

Ponsy Cavanagh
Notary Public

This assignment is approved by me with the understanding that all the terms of the assignment are complied with, and with the further stipulation that once we are notified in writing by the Treasurer of the Blackfeet Tribe that the amount is due and payable under the terms of the above tribal loan, and Treasury check is drawn from the above individual account, the proceeds of such check must be applied on the above loan.

Until 1977, there was no activity on the plaintiff's I.I.M. Account. Then, on March 10, 1977, the Blackfeet Tribal Credit Committee sent a letter to the plaintiff, stating the amount owed on his tribal loans and informed him: "If you do not want your lease income held, please make other satisfactory arrangements."

Two months later, in May 1977, the plaintiff had failed to make other arrangements. Accordingly, the Blackfeet Tribal Credit Committee, acting pursuant to an amended tribal ordinance,[8] presented to the Blackfeet Agency of the B.I.A. the assignments of income executed by the plaintiff for payment from his I.I.M. Account. Payments from that account began in May 1977.

Plaintiff protested these payments and subsequently entered into negotiations with the Blackfeet Tribe and the Blackfeet Agency Superintendent.[9] During the period of negotiations, from November 1977 until January 1979, payments from the plaintiff's I.I.M. Account to the Blackfeet Tribe were suspended.

On January 23, 1979, the Superintendent of the Blackfeet Agency authorized 20% of the income from the plaintiff's I.I.M. Account to be paid to the Blackfeet Tribe. This authorization followed a determination by the Billings Area Field Solicitor for the Department of the Interior[10] that 25 C.F.R. § 104.9 permitted funds of individual Indians to be applied by the Secretary of the Interior or his authorized representative against claims of indebtedness to the tribe of which the individual is a member, unless prohibited by Congress.[11]

On April 12, 1979, the plaintiff sought relief from the Superintendent's action by appeal to the Billings Area Director of the B.I.A. On May 24, 1979, the Area Director issued a written decision upholding the Superintendent's authorization. Plaintiff then appealed to the Commissioner of Indian Affairs, who transferred the appeal to the IBIA pursuant to 25 C.F.R. § 2.19(a)(2).

In its July 8, 1980 decision, the IBIA upheld as effective the $105.50 assignment of income executed by the plaintiff on July 7, 1947. The IBIA concluded that the assignment was properly approved by an authorized representative of the Secretary of the Interior, and was therefore valid under 25 C.F.R. § 104.9. The remaining assignments of income, executed on February 1,

It is further stipulated that, I, as Superintendent, of the Blackfeet Agency, relinquish no authority, in expenditure of trust funds, under Departmental Regulations. It is further stipulated that a completed, signed, copy of this assignment, must be given to the Blackfeet Agency.

It is further stipulated that it is the responsibility of the Treasurer of the Blackfeet Tribe to notify the Blackfeet Agency Office, in writing, relative to drawing check in payment of this loan, in sufficient time to draw such check to it, and the drawing of such check to the above Indian before notification by the Treasurer will in no way affect the delivery of such check so drawn, to the Indian payee.

It is further stipulated that the Blackfeet Agency Office shall currently be notified of payment or payments due on the above loan at least twice a year, such notice to be in writing and signed by the Treasurer of the Blackfeet Tribe. The approval of this assignment is null and void at the option of the Superintendent of the Blackfeet Agency.

> Warin L. O'Hara, Superintendent
> Blackfeet Indian Agency.

8. Tribal Ordinance 51, *as amended by* Tribal Ordinance 55 on September 6, 1976, provides in relevant part: "[A]ll actions ... brought on behalf of the tribe to recover a debt owing to the tribe shall have no prescribed period of limitations."

9. Plaintiff contends these negotiations merely provided an "illusory" form of due process. The federal and tribal defendants claim otherwise. As such, there is a potentially material fact in dispute. As will be discussed in more detail later in this memorandum, the court will not reach the merits of the due process issues raised by the plaintiff. *See* Part III(A)(2), *supra*.

10. The record before the court contains two letters from the Billings Area Field Solicitor for the Department of the Interior which uphold the authority of the Superintendent of the Blackfeet Agency and the Blackfeet Tribe to apply income from the plaintiff's I.I.M. Account as satisfaction for the loans. One letter is dated May 6, 1977; the other September 13, 1978.

11. The text of 25 C.F.R. § 104.9 is set forth at Part III(A)(2) of this memorandum, *infra*.

1944, September 22, 1949, and March 13, 1950, were remanded to the Billings Area Director of the B.I.A. for a determination of whether those assignments and the balance of the account claimed by the Blackfeet Tribe were approved as required by regulation. *Kennerly v. Billings Area Director, Bureau of Indian Affairs*, 8 IBIA 106 (1980).

After traversing the administrative appeals route,[12] the plaintiff sought review in this court, challenging the decision handed down by the IBIA and seeking equitable relief and money damages from the defendants. For the named plaintiff and the plaintiff class, the complaint seeks a preliminary and permanent injunction and/or writ of mandamus prohibiting attachment of I.I.M. Accounts, and a declaratory judgment stating that the defendants violated the due process and just compensation clauses of the Fifth Amendment, plus applicable federal statutes and fiduciary obligations owed to the plaintiff and the plaintiff class in the administration of I.I.M. Accounts. The complaint also seeks a ruling that 25 C.F.R. § 104.9 is an unconstitutional violation of due process under the Fifth Amendment.

For the named plaintiff, the complaint seeks a judgment requiring the defendants to return the money purloined from the I.I.M. Account, together with damages for the use value of the money during the period it was wrongfully withheld. The complaint further seeks an award of damages, including punitive damages, against all the defendants except the United States.

## II. CONTENTIONS OF THE PARTIES

### A. *Federal Defendants*

The federal defendants contend that the present action is a review of the factual determinations made by the IBIA, and that the proper standard of review is whether those factual determinations are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). *United States v. Wharton*, 514 F.2d 406, 409 (9th Cir. 1975). The federal defendants further contend that the plaintiff received adequate due process both prior to and after the attachment of income from his I.I.M. Account in the form of negotiations and administrative review. Finally, the federal defendants argue that their actions in applying money from the plaintiff's I.I.M. Account towards the satisfaction of his tribal loans, pursuant to the assignments of income, were lawful under 25 C.F.R. § 104.9.

### B. *Tribal Defendants*

The tribal defendants argue that the Blackfeet Tribe is immune from suit and must therefore be dismissed.

With respect to the claims for equitable relief and money damages against the tribal agents for violations of the Fifth Amendment, the tribal defendants assert that no federal cause of action has been alleged and that such claims must also be dismissed. This assertion is founded upon the proposition that the Fifth Amendment to the Unit-

---

**12.** The appeals process from the Area Director of the B.I.A. to the IBIA is summarized as follows: 25 C.F.R. § 2.3 provides the general right of appeal to the Area Director from a decision by an official of the B.I.A. Appeals from decisions of the Area Director may then be made to the Commissioner of Indian Affairs; further appeals from the decision of the Commissioner may be made to the IBIA.

25 C.F.R. §§ 2.10–2.20 provide the specific procedures governing appeals to the Area Director and the Commissioner of Indian Affairs. 25 C.F.R. § 2.18 delineates the procedural action to be taken by the Area Director on appeal. 25 C.F.R. § 2.19 outlines the procedural action to be taken by the Commissioner on appeal. 25 C.F.R. § 2.19(a)(2) allows the Commissioner to

refer the appeal to the IBIA for decision; such was the procedure utilized in the present litigation.

For the specific procedures governing appeals to the IBIA, *see* 43 C.F.R. §§ 4.350 *et seq. See especially* 43 C.F.R. § 4.369, which provides that the decision of the IBIA shall be final for the Department of the Interior.

The court is satisfied that the plaintiff has exhausted his administrative remedies pursuant to 43 C.F.R. § 4.21(b). For a discussion of Department of the Interior regulations which require that administrative remedies be exhausted before any administrative decision from the Department may be subject to judicial review, *see Doria Mining & Engineering Corp. v. Morton, supra*, 608 F.2d at 1257.

ed States Constitution does not restrict governmental actions of the tribe, *citing Talton v. Mayes*, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896). In support of this proposition, the tribal defendants argue that Congress has imposed a due process limitation on tribes by statute in the form of the Indian Civil Rights Act [hereinafter "ICRA"], 25 U.S.C. § 1302(8). The United States Supreme Court has construed the ICRA as being enforceable in federal court only for a writ of habeas corpus. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

The tribal defendants finally contend that the tribal agents are being sued for actions taken in their official capacities and within the scope of their tribal authority; thus, any claims asserted by the plaintiff against the tribal agents for money damages are barred by the Blackfeet Tribe's immunity from suit, *citing Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) *and Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and must be dismissed.

### C. *Plaintiff*

Plaintiff disagrees with the contentions advanced by both the federal and tribal defendants. The essence of the plaintiff's argument is that both defendants violated the due process clause of the Fifth Amendment by not providing proper notice or a meaningful opportunity to be heard prior to attaching the money from his I.I.M. Account.

Plaintiff contends that the letter dated March 10, 1977 and sent to him by tribal agent Lucille McKay was nothing more than a demand letter which failed to meet the due process requirements for notice.

According to the plaintiff, the letter is constitutionally insufficient because it failed to outline a grievance procedure with either the Blackfeet Tribal Credit Committee or the B.I.A. prior to the attachment.

Plaintiff further argues that his negotiations with the Blackfeet Tribal Credit Committee and the Superintendent of the Blackfeet Agency did not provide a meaningful opportunity to be heard in accordance with *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).[13] Any due process protections derived from the negotiations were, according to the plaintiff, merely "illusory"; there was no opportunity to question the validity of the debts, raise defenses, or to cross-examine those individuals supporting the validity of the debts.

With respect to the federal defendants, the plaintiff alleges that the federal government violated its trust responsibility to protect his I.I.M. Account by failing to provide for due process safeguards in the attachment of the income from that account.

Plaintiff further claims that this court has jurisdiction over the Blackfeet Tribe pursuant to an exception to sovereign immunity carved out in the case of *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 178 Ct.Cl. 599 (1967). The plaintiff also asserts that the sovereign immunity of the Blackfeet Tribe does not bar suit against the tribal agents for violations of the due process clause of the Fifth Amendment. In support of this assertion, the plaintiff relies on *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the "state action" requirement of the Fourteenth Amendment and 42 U.S.C. § 1983. With respect to the latter, the plaintiff does not claim jurisdic-

---

**13.** In *Goldberg v. Kelly, supra*, the United States Supreme Court set forth what it perceived were the minimum procedural requirements to be utilized in a pretermination hearing. These requirements include (1) notice of grounds for action; (2) opportunity for confrontation; (3) right to oral argument; (4) right to present oral evidence; (5) right to cross-examine witnesses; (6) right to demand disclo-sure of adverse evidence; (7) right to counsel; (8) right to a decision on the record; (9) right to be apprised of the reasons for the decision; and (10) right to an impartial decision-maker. *Goldberg v. Kelly, supra*, 397 U.S. at 266–71, 90 S.Ct. at 1019–22. *But see Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

tion under 42 U.S.C. § 1983. Rather, the plaintiff is attempting to analogize the state action requirement in those § 1983 cases which involve private creditors and state officers with the alleged relationship between the tribal "creditors" and the federal officers in attaching his I.I.M. Account. It is the contention of the plaintiff that the tribal agents used federal officials, acting under federal authority, to attach his I.I.M. Account. This allegedly created a "sufficiently close nexus" between the tribal agents and the federal officers to sustain an award of damages against the tribal agents for violations of the due process clause of the Fifth Amendment.[14]

## III. DISCUSSION

### A. Federal Defendants

#### 1. Standard of Review

The court agrees with the federal defendants that this action involves the judicial review of a decision rendered by an administrative body, i.e., the IBIA. The court does not agree, however, that the appropriate standard of review is the "substantial evidence test" set forth at 5 U.S.C. § 706(2)(E). Rather, this court is of the opinion that the proper standard of review is the "arbitrary and capricious" test set forth at 5 U.S.C. § 706(2)(A).

5 U.S.C. § 706(2)(E) provides in pertinent part:

The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency actions, findings, and conclusions found to be—

\* \* \* \* \* \*

(E) Unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency

hearing provided by statute. [emphasis added.]

■ Under the substantial evidence test, judicial review of an agency's action is authorized only when the agency's action is taken pursuant to the rule-making provisions of 5 U.S.C. § 553, or when the agency's action is based upon a public adjudicatory hearing conducted in accordance with 5 U.S.C. §§ 556–557. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1972).

■ In the present situation, the IBIA decision to uphold the assignment of income dated July 7, 1947, and to remand the remaining assignments to the Area Director for a determination of their validity in light of 25 C.F.R. § 104.9, clearly was not an exercise of a rule-making function. Further, the appeals process available to and utilized by the plaintiff does not require a mandatory hearing to be conducted.[15] Appeals brought before the Area Director of the B.I.A. and the Commissioner of Indian Appeals are disposed of by written decision. 25 C.F.R. § 2.18–2.19. Appeals reaching the IBIA may be subject to a hearing before an administrative law judge, or may be subject to a final disposition without a hearing. 43 C.F.R. §§ 4.361(a)–4.369.[16] No such hearing was held during the administrative procedures phase of this action. Hence, no record was produced to serve as the basis for review of the agency action. Such a record is the basic prerequisite for application of the substantial evidence test. Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 415, 91 S.Ct. at 823.

■ When a hearing is not required prior to a final agency action, as occurred here, the proper standard of judicial review is set forth at 5 U.S.C. § 706(2)(A). Citizens to Preserve Overton Park, Inc. v. Volpe, supra,

---

14. For a discussion of the "sufficiently close nexus" rationale, see Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

15. See note 12 and accompanying discussion, supra.

16. Opportunity for oral argument in front of the IBIA prior to a final decision is discretionary with the Board. 43 C.F.R. § 4.25.

401 U.S. at 416, 91 S.Ct. at 823. That section requires a finding that the agency action was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In making such a determination, the reviewing court must consider whether the decision rendered was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823; *Nance v. Environmental Protection Agency,* 645 F.2d 701, 705 (9th Cir. 1981). While the inquiry into the facts is to be careful, the standard of review is narrow: the court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823.

## 2. *Disposition*

It is the opinion of this court that the IBIA considered all the relevant factors placed before it in handing down its decision and did not error in its judgment.

▮ The IBIA found that the July 7, 1947 assignment of income executed by the plaintiff was properly approved pursuant to 25 C.F.R. § 104.9; the remaining assignments were remanded to the Billings Area Director of the B.I.A. for a determination of whether they were approved as required by regulation. In essence, the plaintiff was granted a form of relief. 25 C.F.R. § 104.9 states in relevant part:

Funds of individuals may be applied by the Secretary [of the Interior] or his authorized representative against delinquent claims of indebtedness to the Unit-

ed States or any of its agencies or to the tribe of which the individual is a member. . . . Funds derived from the sale of capital assets which by agreement approved prior to such sale by the Secretary or his authorized representative are to be expended for specific purposes, *and funds obligated under contractual arrangements approved in advance by the Secretary or his authorized representative* or subject to deductions specifically authorized or directed by acts of Congress, shall be disbursed only in accordance with the agreements. . . . [emphasis added.]

The IBIA upheld the validity of 25 C.F.R. § 104.9. In so doing, the IBIA cited 25 U.S.C. § 410 [17] and noted that "[t]he practice of allowing the encumbrance or assignment of trust assets under certain conditions controlled by Departmental regulations has been approved and is of long standing." *Kennerly v. Billings Area Director, Bureau of Indian Affairs, supra,* 8 IBIA at 113.

It is the opinion of this court that the IBIA, in reviewing the assignments of income executed by the plaintiff in light of 25 C.F.R. § 104.9 considered the relevant factors in reaching its decision. Accordingly, this court will not disturb the findings and conclusions of the IBIA. It is well-settled that the construction of a statute proffered by the agency charged with its administration is entitled to great respect. *See Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 660, 96 S.Ct. 1793, 1799, 48 L.Ed.2d 274 (1976) and cases cited therein. [18]

In holding that the decision of the IBIA was not arbitrary or capricious under 5 U.S.C. § 706(2)(A), and in light of the fact

---

**17.** 25 U.S.C. § 410 states:

No money accruing from any lease or sale of land held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period, or, in case of a minor, during his minority, *except with the approval and consent of the Secretary of the Interior.* [emphasis added.]

**18.** Plaintiff attacks the procedures utilized by the B.I.A. in its appeals process on the grounds that it lacks the opportunity for a face-to-face

hearing. While a hearing is not mandatory in this particular procedure, this does not mean that the opportunity is non-existent. 43 C.F.R. § 4.361(a) provides that the IBIA "may require a hearing when it is necessary to resolve a genuine issue of material fact. This court is satisfied that the B.I.A. officials and the IBIA acted within their statutory framework during the course of proceedings at the administrative level. *See* Part III(A)(1) of this memorandum, *supra. See also* note 12 and accompanying discussion, *supra.*

that the plaintiff was given relief, this court does not reach the merits of the due process claims raised by the plaintiff against the federal defendants. Thus, the court finds no material facts in dispute.[19] Accordingly, the motion for partial summary judgment, filed by the federal defendants, is granted.

### B. *Tribal Defendants*

#### 1. *Blackfeet Tribe*

The plaintiff claims that the Blackfeet Tribe may be sued in this action pursuant to an alleged "money improperly exacted or detained" exception to the doctrine of sovereign immunity. The plaintiff argues that the Blackfeet Tribe illegally retained money in his I.I.M. Account and thus falls within the exception to sovereign immunity enunciated in *Eastport Steamship Corp. v. United States, supra,* and acknowledged in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The "money improperly exacted or retained" exception is described by the Court of Claims as follows:

> We have referred to these cases as those in which "the Government has the citizen's money in its pocket" and the claim is "to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute "[citations omitted]; and we have held that "suit can be brought in this court to recover [such] exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere)." [citation omitted].

*Eastport Steamship Corp. v. United States, supra,* 372 F.2d at 1007–08.

A closer reading of *Eastport Steamship Corp. v. United States, supra,* reveals that the above-described exception to sovereign immunity is a delineation by the Court of Claims of its own jurisdictional authority pursuant to the Tucker Act, 28 U.S.C. § 1491. The Tucker Act is a jurisdictional

consent statute which waives the immunity of the United States from money damages in certain classes of cases. There is no indication, nor is this court inclined to so find, that this exception is applicable to Indian tribes.

It is a well-settled proposition of law that Indian tribes may not be sued in state or federal court absent express Congressional authorization. *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 58, 98 S.Ct. at 1677; *Puyallup Tribe v. Washington Department of Game,* 433 U.S. 165, 172–73, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977); *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940). *See also Boe v. Fort Belknap Indian Community,* 642 F.2d 276 (9th Cir. 1981); *Trans-Canada Enterprises v. Muckleshoot Indian Tribe,* 634 F.2d 474 (9th Cir. 1980); *Colliflower v. Garland,* 342 F.2d 369 (9th Cir. 1965). There is no applicable consent here; therefore, the Blackfeet Tribe is immune from suit and must be dismissed.

#### 2. *Tribal Agents*

Plaintiff seeks both equitable relief and money damages from the tribal agents. The thrust of the plaintiff's arguments is that the tribal agents are liable for violations of the due process clause of the Fifth Amendment as a result of their participation in the attachment of his I.I.M. Account. Two theories are advanced by the plaintiff in support of his claim, one pursuant to the 42 U.S.C. § 1983 state action analogy discussed previously;[20] the other pursuant to *Bivens v. Six Unknown Agents, supra.* In *Bivens,* the United States Supreme Court upheld an implied cause of action for damages against a federal official who acted in violation of the Fourth Amendment. This court is not convinced by either argument.

Indian tribes are generally regarded as being unrestricted by those constitutional provisions that limit only the federal or state governments. Thus, in *Talton v.*

---

**19.** *See* note 9 and accompanying discussion, *supra.*

**20.** *See* Part II(C) of this memorandum, *supra.*

*Mayes, supra,* 163 U.S. at 384, 16 S.Ct. at 989, the United States Supreme Court held that the Fifth Amendment did not operate upon the powers of local self-government enjoyed by Indian tribes. This proposition was upheld in *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 56, 98 S.Ct. at 1675. Hence, this court is not in a position to find a cause of action for either equitable relief or money damages against the tribal agents stemming from violations of the due process clause of the Fifth Amendment.

The tribal agents were performing their official duties when they attempted to collect the loans owed to the Blackfeet Tribe by the plaintiff. Upon closer scrutiny it becomes apparent that this is a dispute between Indians of the same tribe concerning the method and procedure for collecting tribal loans. It is an intra-tribal controversy, clearly within the province of the Blackfeet Tribe, and beyond the jurisdiction of the federal courts.

For the very reason that restrictions such as the Fifth Amendment do not apply to Indian tribes, Congress enacted the ICRA. In *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 66–67, 98 S.Ct. at 1681, the United States Supreme Court held that the only federal cause of action available to enforce the ICRA is for writ of habeas corpus under 25 U.S.C. § 1303; other claims must be made in tribal forums. Plaintiff cannot attempt to circumvent the implications of the ICRA by filing suit against the tribal agents in federal court for violations of the Fifth Amendment. Any due process claims against the tribal agents properly arise under 25 U.S.C. § 1302(8) and belong in tribal court. Thus, the claims for equitable relief and money damages sought from the tribal agents must also be dismissed.[21]

Accordingly, the motion to dismiss the Blackfeet Tribe and the named tribal agents is granted.

## IV. CONCLUSION

An appropriate order shall issue.

21. In dismissing the claims for equitable relief and money damages against the tribal agents for violations of the Fifth Amendment, the court does not reach the merits of the argument that the tribal agents are protected by the Blackfeet Tribe's governmental immunity.