Anna ASHBY, Plaintiff,

v.

**ISLE OF WIGHT COUNTY SCHOOL BOARD, Defendant.**

No. CIV.A. 2:03CV540.

United States District Court,
E.D. Virginia,
Norfolk Division.

Dec. 15, 2004.

Lanis Loretha Karnes, Karnes Legal Services, PC, Jackson, TN, for Plaintiff.

Robert William McFarland, Steven R. Zahn, McGuirewoods LLP, Norfolk, VA, for Defendant.

## *MEMORANDUM OPINION & ORDER*

JACKSON, District Judge.

Before the Court is the Motion of Isle of Wight County School Board ("Defendant" or "Board") for Summary Judgment. Additionally before the Court is the Cross Motion of Anna Ashby ("Plaintiff") for Partial Summary Judgment.[1] For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's federal claims, and Plaintiff's motion for Partial Summary Judgment is **DENIED**. Plaintiff's remaining claims are **DISMISSED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Windsor High School ("WHS") is a public high school in the district of Isle of

---

1. The Court also notes the following motions have been filed by the parties: Defendant's Motion to Quash a Subpoena Duces Tecum issued to Patricia Morgan; Plaintiff's Renewed Motion for Disqualification of Counsel; Defendant's Motion to Strike Plaintiff's Renewed Motion; and Plaintiff's Objections to Defendant's Proposed Jury Instructions. The motions are moot in light of the Court's ruling on summary judgment.

Wight County Schools. The only other public high school in the district is Smithfield High School. (Final Pretrial Order ¶ A3.) William Owen ("Owen") served as principal of WHS during the 2002–03 school year. (Final Pretrial Order ¶ A5.) Dr. Michael McPherson ("McPherson") served as Superintendent of the Isle of Wight County Schools during the 2002–03 school year. (Final Pretrial Order ¶ A4.)

Defendant, Isle of Wight County School Board, serves as the local governing body for all schools in Isle of Wight County, Virginia. (Final Pretrial Order ¶ A1.) Defendant Board is a duly organized instrumentality of the Commonwealth of Virginia. (Final Pretrial Order ¶ A1.) During the 2002–03 school year, A. Gene Lowery ("Lowery"), Barbara B. Olin ("Olin"), George A. Bradby ("Bradby"), Pamela J. Edwards ("Edwards"), and Richard L. Peerey ("Peerey") served as members of the Board. (Final Pretrial Order ¶ A2.) H. Woodrow Crook ("Crook") served as the Attorney for the Board during this time. (Final Pretrial Order ¶ A6.)

Defendant adopted as part of its policies a resolution entitled "Religion in the Schools." (Appx. Pl. Br. Opp. Def. Mot. Summ. J. & Supp. Summ. J. at 292.) The policy reads:

In accordance with the mandate of the Constitution of the United States prohibiting the establishment of religion, it is the policy of this School Board that the Isle of Wight County Schools shall be neutral in matters of religion. This means the Isle of Wight County Schools:

— will assume no role or responsibility for the religious training of any student; and

— will in no way become involved in the religious belief, disbelief, or doubt of any student.

This requirement of neutrality need not preclude nor hinder the Isle of Wight County Schools in fulfilling their responsibility to educate students to be tolerant or respectful of religious diversity. The division also recognizes that one of its educational responsibilities is to advance the student's knowledge and appreciation of the role that religion has played in the social, cultural, and historical development of civilization.

Therefore, the division shall approach religion from an objective, curriculum-related perspective, encouraging all students and staff members to be aware of the diversity of beliefs and respectful of each other's religious and/or non-religious views. In that spirit of respect, students and staff members may be excused from participating in activities that are contrary to their religious beliefs unless there are clear issues of compelling public interest that would prevent it.

Isle of Wight County School Board, *Religion in the Schools INDC* (revised Aug. 9, 2001), *in* School Board Policy Manual, *available at* http://www.iwcs.k12.va.us/policy/INDC.html (last modified Aug. 12, 2004).

Plaintiff considers herself a Christian by faith and is a member of the Franklin Church of God in Franklin, Virginia. (Pl. First Am. Compl. ¶ 8.) Plaintiff's father, Bishop James Ashby ("Bishop Ashby") is the pastor of this church. (Pl. First Am. Compl. ¶ 8.) Plaintiff asserts that sharing her faith with others is an integral part of her religious beliefs. (Pl. First Am. Compl. ¶ 8.)

## A. Factual Background

During the 2002–03 school year, Plaintiff was a member of the senior class at Windsor High School. (Final Pretrial Order ¶ A9.) LuAnn Scott ("Scott"), an English teacher at WHS, served as the senior class sponsor for Plaintiff's class. (Final Pretrial Order ¶ A7.) Patricia Morgan ("Mor-

gan") was the choral teacher at WHS. (Final Pretrial Order ¶ A8.) The parties dispute the sequence of events leading up to the graduation ceremony in 2003. The Court sets forth the relevant facts as asserted by the parties.

In the years leading up to 2003, the WHS graduation ceremony usually included a small number of student speakers and singers. The general practice was that the valedictorian, the salutatorian, and the class officers would speak. (Dep. Morgan at 34–35; Dep. Owen at 41–43; Dep. Robertson at 14–15; Dep. Scott at 30–34.) If a song was sung, the school choir would sing it, although at least once a senior member of the choir sang a solo. (Dep. Owen at 56–57; Dep. Scott at 34.) Plaintiff alleges that in years prior to 2003, students had been allowed to volunteer to sing at the school's graduation exercises, and the songs were chosen by those students. (Pl. First Am. Compl. ¶ 9.) Defendant denies this practice ever occurred. (Def. First Am. Answer ¶ 9.)

The parties agree that some time in the spring of 2003, Plaintiff and a fellow student, Graylin Stokes ("Stokes"), volunteered to sing at the 2003 graduation ceremony. (Final Pretrial Order ¶ A10.) The parties disagree about whether the students were invited to volunteer or stepped forward of their own initiative, and to whom they first mentioned their interest. (Pl. First Am. Compl. ¶ 10; Aff. Stokes ¶¶ 4–6, 9; Dep. Owen at 31–32, 55–56; Dep. Pl. at 10–11, Ex. 2; Dep. Scott at 38, 44, 141–42.) Plaintiff became the primary contact with the teachers and administrators for she and Stokes. (Aff. Stokes ¶¶ 9–14.)

Plaintiff admits that she was never told that she and Stokes would sing at the graduation ceremony.[2] (Dep. Pl. at 54.) Plaintiff and Plaintiff's Mother, Natalie Ashby ("Mrs.Ashby"), Morgan, Scott, and Owen had a series of discussions with each other about the potential performance of Plaintiff and Stokes at the graduation ceremony, although the depositions of each person reflect very different recollections of the events. (Aff. Mrs. Ashby ¶¶ 5–7; Dep. Morgan at 28, 37, 40–41, 67; Dep. Owen at 66, 68, 73; Dep. Pl. at 41–42, 46–47; Dep. Scott at 38–49.) Nor can the individuals involved come to agreement on exactly how and why the lyrics reached Owen. (Dep. Morgan at 28–31; Dep. Owen at 64–65, 72; Dep. Pl. at 46, 54; Dep. Scott at 51, 54–56.)

Regardless, at some point Principal Owen received a copy of the lyrics to "The Prayer," as performed by Celine Dion.[3] The lyrics to "The Prayer," as provided by the Plaintiff to the school, are as follows:

> I pray you'll be our eyes, and watch us where we go And help us to be wise in times when we don't know Let this be our prayer, when we lose our way Lead us to the place, guide us with your grace To a place where we'll be safe.

> I pray we'll find your light, and hold it in your hearts When stars go out each night, remind us where you are Let this be our prayer, when shadows fill our day Help us find a place, guide us with your grace Give us faith so we'll be safe

> A world where pain and sorrow will be ended And every heart that's broken will be mended And we'll remember we

---

2. In other words, Plaintiff's song was never a part of the graduation ceremony. Any decision to include the performance would have been a change to the program. The decision not to include the performance did not contradict anything Plaintiff had been told by school officials.

3. Plaintiff had also selected a second song, "Whenever You Call," sung by Brian McKnight and Mariah Carey. (Dep. Pl. at 45–46.)

are all God's children Reaching out to touch you Reaching to the sky

We ask that life be kind, and watch us from above We hope each soul will find another soul to love Let this be our prayer, just like every child Who needs to find a place, guide us with your grace Give us faith so we'll be safe Needs to find a place, guide us with your grace Give us faith so we'll be safe.

(Pl. First Am. Compl. ¶ 13; Dep. Pl.Ex. 1.)[4] Owen sent the lyrics to Superintendent McPherson. (Dep. Morgan at 30; Dep. Owen at 73.) There is some dispute as to the specific reasons why Owen sent the lyrics to McPherson,[5] but there is agreement that Owen wanted advice on whether the song was appropriate for graduation given the perceivable religious overtones. (Aff. Stokes ¶ 16; Dep. McPherson at 87–89; Dep. Owen at 73, 76–85.) The advice of Crook and McPherson was that the song was not appropriate for graduation; the parties dispute whether Owen maintained any discretion to ignore this advice. (Pl. First Am. Compl. ¶ 15; Dep. McPherson at 24–25, 65–66; Dep. Owen at 78–80.)

At some later point, Owen, Scott, Morgan, or some combination of them told Plaintiff that she and Stokes would not be able to sing any song at graduation. (Dep. Morgan at 33; Dep. Owen at 66, 73, 85–91; Dep. Pl. at 47, 55–56; Dep. Scott at 68, 74–76, 84–93.) Plaintiff was encouraged to sing at the baccalaureate or another graduation-related activity. (Dep. Owen at 66, 73.) Owen claims that the reason Plaintiff could not sing was because of the time constraints on the ceremony.[6] (Dep. Owen at 66, 73, 85–91.) Plaintiff testified that she was told that the singing had been cut because no one could make a decision on whether to include singing, and some decision had to be made, so the decision was not to include it. (Dep. Pl. at 55.) Plaintiff admits that it was her understanding that no decision had been made as to whether to include singing, not that a decision had been made to include singing, which was now being reversed. (Dep. Pl. at 56.)

When Plaintiff learned she would not be singing, Plaintiff called her mother, and Plaintiff told her mother that Plaintiff's song had been cut from the program. (Dep. Pl. at 47.) Mrs. Ashby claims that she then called Owen, who told Mrs. Ashby that the attorney, Crook, had advised the school the song would not be appropriate and that the song would not be sung. (Aff. Mrs. Ashby ¶¶ 8–10.) Owen believes he had a brief conversation with one of Plaintiff's parents about the fact that no song would be sung at commencement due to the time limitations; he believes that it was with Bishop Ashby, but admits it could have been Mrs. Ashby. (Dep. Owen at 99–100; 111–12.) Bishop Ashby claims that he then called McPherson, who allegedly told Bishop Ashby that Crook would not allow the song to be sung. (Aff. Bishop

---

**4.** Plaintiff appears to have printed the lyrics on April 4, 2003. It is not clear how long afterwards Owens received the lyrics, but it is worth noting because it is one of the few dates the Court is able to establish with any certainty.

**5.** The dispute centers on whether the answer to this inquiry was ever meant to be determinative of Owen's decision regarding adding the song to the program.

**6.** The graduation ceremony had to be held to one hour and ten minutes because this was the first year that the ceremonies for both high schools in the district were staggered to allow the school board members and other dignitaries to attend both ceremonies. (Dep. Owen at 51–52.) WHS held its graduation at six o'clock p.m. and Smithfield High School held its graduation at eight o'clock. (Dep. Owen at 52.) Owen testified that the programs are sent to the printer about 45 days before the ceremony. (Dep. Owen at 138.)

Ashby ¶¶ 3–6; Dep. Bishop Ashby at 24–25.)

Bishop Ashby approached Peerey, the member of the school board for Plaintiff's district, and asked how best to handle the situation. (Aff. Bishop Ashby ¶¶ 7–9; Dep. Bishop Ashby at 26–27.) Peerey recommended that Bishop Ashby appear before a closed session of the school board. (Aff. Bishop Ashby ¶ 10; Dep. Bishop Ashby at 26–27; Dep. Peerey at 38.) If the issue involved a student, the Board would hold a closed session to protect the student's privacy. (Dep. Bradby at 22; Dep. Peerey at 39.) Peerey had told Bishop Ashby that the proper procedure was to contact the clerk to sign up to be on the agenda. (Dep. Peerey at 38.) Peerey then told Bishop Ashby that the Board would have to hear his issue, then if someone on the Board wanted to call a vote, the Board would have to meet in open session again to vote. (Dep. Peerey 47–48, 89–90.)

However, Bishop Ashby did not specifically arrange to be put on the agenda, but did call some time prior to the meeting on June 12, 2003 to ask to speak to the Board, and showed up at this meeting with his daughter. (Dep. Bishop Ashby at 27–28; Dep. Bradby at 25; Dep. Olin at 12; Dep. Peerey at 40–41.) Plaintiff alleges that at this meeting the Defendant decided not to permit Plaintiff to sing "The Prayer." Plaintiff alleges this decision was based on the religious nature of the song's lyrics. (Pl. First Am. Compl. ¶ 16.) Defendant denies these allegations. (Def. First Am. Answer ¶ 16.) After the public school board meeting, the board members opened a closed session to address other matters, but heard from Bishop Ashby and Plaintiff, as well. (Dep. Olin at 23–24; Dep. Peerey at 40–41; Dep. Pl. at 78; see Dep. Bradby at 23–24.) Bishop Ashby contends that there was much discussion of the board members' personal religion and separation of church and state during the meeting, and one member indicated that the Board could not allow Plaintiff to sing her song because then the board would have to allow "Muslims to stand up and say, 'Oh, Allah, bless us, for there are planes with bombs on it so we can kill people, help us, oh God, Allah.'" (Aff. Bishop Ashby ¶¶ 12–16, 19; Dep. Pl. at 81; see Dep. Olin at 44, 47.) Peerey contends that Bishop Ashby was very aggressive and challenged the faith of the board members, which evoked passionate responses from the board members. (Dep. Peerey at 55–61.) Peerey agrees that one of the board members asked what it would mean if a student of another religion was to make the same request. (Dep. Peerey at 55.) Bishop Ashby allegedly responded that it was different because "we're Christian." (Dep. Peerey at 55; see Dep. Olin 43–45.) Plaintiff brought a compact disc with the song "The Prayer" on it, but the Board never asked to hear the song. (Dep. Pl. at 85.) Lowery, the head of the school board, allegedly said "We've made a decision not to let your daughter speak" at graduation, because Crook had informed the Board that it was improper to sing "The Prayer" to a captive audience. (Aff. Bishop Ashby ¶¶ 18, 20; Dep. Bishop Ashby at 38.) The board members do not recall anyone saying that a decision had been made. (Dep. Bradby at 34–35; Dep. McPherson at 33; Dep. Peerey at 58–59.) It is undisputed that no vote was held on the matter. (Dep. Bishop Ashby at 38; Dep. McPherson at 32–37; Dep. Olin at 54–55.) No one recalls that Bishop Ashby asked the Board to take any specific action. (Dep. Olin at 55–57.)

Plaintiff attended her graduation the next day, on June 13, 2003. The graduating class sang the school's alma mater at the graduation ceremony. (Pl. First Am. Compl. ¶ 17.) No other songs were performed during the graduation. (Dep. Pl. at 86.) The speakers at the ceremony

were the class president, vice-president, valedictorian, and salutatorian. (Dep. Bradby at 57; Dep. Owen at 41–43.) Plaintiff alleges that a student speaker, Dwight Robertson ("Robertson") spoke from the Bible and told the biblical story of Joseph. (Pl. First Am. Compl. ¶ 18; Aff. Stokes ¶ 22; Pl. Dep. at 91–92.) Defendant denies that the speaker spoke from the Bible. (Def. First Am. Answer ¶ 18.) Robertson noted in his speech that he was telling the story of Joseph, which is included in the Bible, but claimed the story makes no reference to religion. (Dep. Robertson Ex. 1.) Robertson used the tale of Joseph to illustrate the theme of his speech, that people can overcome times of adversity. (Dep. Robertson at 43, Ex. 1.)

## B. Procedural Posture

On July 30, 2003 Plaintiff filed her Complaint subject to defect.[7] Defendant filed a motion to dismiss on September 30, 2003. In a hearing before the Court on April 26, 2004, the Court denied Defendant's motion to dismiss and claims for sovereign and qualified immunity.[8] On May 10, 2004, Defendant filed its Answer. On August 23, 2004, Defendant filed an Amended Answer. On October 26, 2004, Defendant filed the current motion for Summary Judgment. On November 8, 2004, Plaintiff filed a cross motion for Summary Judgment and a reply to Defendant's mo-

tion. On November 12, 2004, Plaintiff filed its First Amended Complaint. On November 23, 2004, the Court received the last of a series of Memoranda and Replies to the motions for Summary Judgment. On November 24, 2004, Defendant filed its Answer to Plaintiff's First Amended Complaint. On December 3, 2004, Plaintiff filed a motion withdrawing certain claims. *See infra* note 9.

Plaintiff contends that this Court has jurisdiction pursuant to the existence of a federal question pursuant to 28 U.S.C. § 1331 and a deprivation of civil rights pursuant to 28 U.S.C. § 1343(a)(3). Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983.[9]

Plaintiff brings four causes of action against Defendant.[10] Two causes of action are brought for violations of the Constitution of the United States; to wit, that Defendant violated (1) Plaintiff's right of free speech pursuant to the First Amendment; and (2) Plaintiff's right of equal protection under the law as guaranteed by the Fourteenth Amendment. Two causes of action are brought for violations of the constitution of the Commonwealth of Virginia; to wit, that Defendant violated (1) Plaintiff's right of free speech pursuant to Article I § 12; and (2) Plaintiffs right of equal protection pursuant to Article I § 11.

7. A corrected Complaint was filed August 22, 2003.

8. The basis for this ruling is recorded in the Court's written Memorandum Opinion and Order of April 29, 2004.

9. Plaintiff also cites 20 U.S.C. § 1232g and 20 U.S.C. § 1232h(b) as grounds for her claims. These statutes do not create private causes of action, but might serve as the basis for an action pursuant to 42 U.S.C. § 1983. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 285–87, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Nat'l Home Equity Mortgage Ass'n v. Face,* 322 F.3d

802, 804 (2003)(per curiam). However, Plaintiff presents her claims as ones for violations of her constitutional rights, and nothing in the facts Plaintiff has alleged would constitute a violation of these statutes. Therefore, the Court does not address the relevancy of these statutes to Plaintiff's § 1983 claim.

10. Plaintiff's First Amended Complaint contained eight causes of action, but on December 3, 2004, Plaintiff withdrew as issues for trial or summary judgment four causes of action; to wit, constitutional claims under the federal and state free exercise clauses and the federal and state establishment clauses.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment if the Court, viewing the record as a whole, determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Haulbrook v. Michelin North Amer., Inc.*, 252 F.3d 696, 700 (4th Cir.2001)(citing *McKinney v. Bd. of Trustees*, 955 F.2d 924, 928 (4th Cir.1992))("[S]ummary judgment should be granted only when it is perfectly clear that no issue of material fact exists, and it is not necessary to inquire further into the facts in order to clarify the operation of the law.") In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat summary judgment, the nonmoving party must go beyond the pleadings with affidavits, depositions, interrogatories, or other evidence to show that there is in fact a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

## III. DISCUSSION

Plaintiff claims that Defendant violated her First Amendment right to freedom of speech and Fourteenth Amendment right to equal protection under the law, as applicable to the municipality pursuant to the Fourteenth Amendment. Plaintiff requests that the Court grant her nominal compensatory damages in the amount of one dollar ($1), enter a declaratory judgment as to the constitutionality of Defendant's policies, and award Plaintiff attorney's fees and costs. For the reasons set forth below, the Court finds that no genuine issue of material fact exists, and summary judgment in favor of Defendant on Plaintiff's federal claims is appropriate.

### A. Mootness

■ "When students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate." *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir.2003), *cert. denied*, 541 U.S. 1019, 124 S.Ct. 1750, 158 L.Ed.2d 636 (2004)(citing *Bd. of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir.2000); *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir.2000)). However, a student may still maintain a claim for damages, even after graduation. *Mellen*, 327 F.3d at 365.

■ Plaintiff requests compensatory damages, a declaratory judgment against the policies of the Defendant, and attorney fees. On June 13, 2003, Plaintiff graduated from Windsor High School, within the Isle of Wight County Schools district. Because Plaintiff graduated over one year ago, and there is no reasonable expectation that she will be subject to the same action again, her request for declaratory judgment is **MOOT**. However, the Court will consider Plaintiff's claim for compensatory damages for violation of her constitutional rights.

### B. Municipal Liability under § 1983

■ Plaintiff brings her claims pursuant to 42 U.S.C. § 1983. Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has treated Virginia school boards as "municipalities" for purposes of § 1983 claims. *See e.g., Riddick v. School Bd. of Portsmouth,* 238 F.3d 518, 522–523 (4th Cir.2000)(analyzing the liability of a school board in Virginia as a municipality for purposes of a § 1983 action); *Hughes v. Halifax County Sch. Bd.,* 855 F.2d 183, 185 (4th Cir.1988)(same). Municipalities are "persons" within the meaning of § 1983. *Monell v. New York City Dep't of Soc. Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). If "a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by a municipality's officers directly caused a constitutional violation, then the municipal body may be sued directly. *Monell,* 436 U.S. at 690, 98 S.Ct. 2018. In the absence of formal approval, a municipality still may be found liable for a constitutional violation if such violation occurred pursuant to municipal custom. *Id.* at 690–91, 98 S.Ct. 2018. However, a municipality may not be held liable under the doctrine of *respondeat superior;* the constitutional violation must be brought about by a municipality's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. 2018.

To determine if an municipal actor is one who can subject the municipality to liability for unconstitutional policy, a court must ask whether the actor had "final policymaking authority." *Praprotnik,* 485 U.S. at 123–24, 108 S.Ct. 915. Whether a particular actor has "final policymaking authority" is determined by state law. *Id.* Then the Court must ask whether challenged action was taken in accordance with a policy adopted by the actor who was responsible at state law for making the policy in that sphere of the municipality's power. *Id.* at 123–24, 108 S.Ct. 915.

A court may not assume "that municipal policymaking authority lies somewhere other than where the applicable law purports it to be." *Praprotnik,* 485 U.S. at 126, 108 S.Ct. 915. The public school system in the Commonwealth of Virginia is supervised by local school boards. Va. Const. Art. VIII, § 7 (1971); *see Riddick,* 238 F.3d at 523. A school board may employ principals. Va.Code Ann. § 22.1–293(A) (2004). The principal of a school is "responsible for the administration of and shall supervise the operation and management of the school or schools and property to which he has been assigned, in accordance with the rules and regulations of the school board and under the supervision of the division superintendent." Va.Code. Ann. § 22.1–293(B) (2004). The division superintendent is also supervised and appointed by the school board. *See* Va.Code. Ann. § 22.1–60(A); *Flickinger v. Sch. Bd. of Norfolk,* 799 F.Supp. 586, 592 (E.D.Va. 1992). It is clear that final policymaking authority rests with the Defendant Board, not Principal Owens, Superintendent McPherson, nor the school district's attorney, Crook.

*1. There Was No Official Policy Nor Custom to Exclude Songs with Religious Themes*

■ If the Court accepts the Plaintiff's allegations as true, the action challenged in this case is the decision to prohibit Plain-

tiff from singing "The Prayer" at the WHS graduation ceremonies because of the religious content of the song. There is no evidence in the record before the Court that Defendant had an official, express policy requiring the exclusion of all religious student-presented songs from graduation ceremonies. Nor have the Plaintiff's presented any evidence that such a prohibition was the custom or usage in the school district. The next question is whether Principal Owen's decision was an action that rises to the level of official policy.

■ Plaintiff contends that Defendant delegated its authority to make policy for the graduation ceremonies to the principals of the schools, including Owen. Plaintiff supports her contention with the depositions of members of the school board. Even if the Court were to accept the deposition of a few members of the Board as indicative of the policy of the entire Board, the testimony of these members does not support Plaintiff's claim. The chair of the Board, Lowery, indicated that "[t]he principals plan their graduations, and they administer the process." (Dep. Lowery at 65.) Lowery and other members of the school board assumed schools always conducted some form of prior review of any student presentation to be given at graduation because the school board policy dictates "the separation of church and state." (Dep. Lowery at 65–66; Dep. Olin at 51–52.) However, it is clear from Lowery's testimony that he expected the principal to act in accordance with this policy of separation of church and state, not to create new policy. Nor did Lowery indicate that he expected all student-presented religious songs to be prohibited; he merely stated his belief that all student presentations should be reviewed for compliance with the school board policy. There is no evidence that Defendant Board delegated its policymaking authority to Principal Owen. Defendant specifically retained the right to have the final policymaking authority

through its grievance procedures. *See* Isle of Wight County School Board, *Public Complaints KL* (revised Oct. 10, 1996), *in* School Board Policy Manual, *available at* http://www.iwcs.k12.va.us/policy/KL.html (last modified Oct. 10, 1996); (Dep. Bradby at 35; Dep. McPherson at 22–23; Dep. Olin at 33–36, 57).

■ Regardless, the decision of a subordinate may still create policy for the municipality if the final policymaker acts in such a way as to convert the decision into policy. As the *Praprotnik* Court explained:

Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by a supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official. But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority....

*Praprotnik,* 485 U.S. at 130, 108 S.Ct. 915 (citations omitted). Accordingly, to determine whether a municipal policymaker has made the discretionary decision of a subordinate into policy, a court must look at two factors: (1) whether the challenged activity is so pervasive as to constitute custom

or usage, even though it has not been expressly stated as municipal policy, and (2) whether the challenged activity and the basis for such activity was subject to review and ratified by the authorized policymakers, even though a subordinate actor made the initial decision. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915.

As stated above, there is no evidence in the record that prohibition of student-presented religious songs has happened at any previous time. There is no evidence to support a finding that actions like the one taken by Principal Owen are so pervasive throughout the school district as to constitute custom or usage. Therefore, Plaintiff must show that Defendant reviewed and ratified both the decision by Principal Owen and his basis for his decision. Defendant must have ratified the decision to exclude the song on the grounds that it was religious in nature.

### 2. *There Was No Ratification of a Subordinate's Decision*

■ Ratification requires at least knowledge of the alleged violation. *Christie v. Iopa,* 176 F.3d 1231, 1239 (9th Cir.1999). To establish that the Board violated the Equal Protection Clause, Plaintiff must show that the Board ratified a decision by Owen to prefer one religion over another, and his basis for that decision. Plaintiff argues that Robertson's speech was also religious, in that it told the story of a character from the Bible, yet Robertson was allowed to give his speech. Without determining whether Robertson's speech was religious or not, the Court finds that no genuine issue of material fact exists as to whether Defendant ratified any such decision by Owen. Plaintiff never alleges that any member of the board was even aware of the contents of Robertson's speech—or any other student presentation—prior to the actual delivery of that speech at the graduation ceremony. No evidence exists in the record that shows

that anyone but Scott ever reviewed Robertson's speech. (Dep. Owen. at 45–48; Dep. Robertson at 32–33; Dep. Scott at 101–04, 113.) Plaintiff has not alleged and cannot show that Defendant was ever aware of the content of Robertson's speech, nor that Defendant ever had the opportunity to ratify Scott's approval of Robertson's speech. Accordingly, Plaintiff cannot bring her claim for a violation of the Equal Protection Clause against the Board under § 1983.

However, it is clear that before the graduation ceremony, Defendant had knowledge of Owen's decision not to include Plaintiff's song in the ceremony. Plaintiff alleges that the Defendant also had knowledge that Owen's reason for declining to include the song was its religious nature. However, mere knowledge of the act is not enough. There must be some approval of the act, not just refusal to overrule the act. *Christie,* 176 F.3d at 1239. What is less clear from existing precedent is where courts draw the line between refusal and approval. *See e.g., Christie,* 176 F.3d at 1239–40 (finding that a rational trier of fact could find ratification where state prosecutor was aware of a deputy prosecutor's selective prosecution and participated in the investigation in such a way as to show approval of the selective prosecution); *Lytle v. Carl,* 382 F.3d 978, 988 n. 2 (9th Cir.2004)(noting that the jury was properly instructed that ratification requires both knowledge of the violation and "proof that the policymaker specifically approved of the subordinate's act" and that a jury might find approval in the assistant superintendent's participation with subordinates in violations); *Feliciano v. City of Cleveland,* 988 F.2d 649, 656 (6th Cir.1993)(finding no ratification where director of public safety knew police chief intended to administer drug tests to police recruits but did not expressly approve of the tests); *Gillette v. Delmore,* 979 F.2d

1342, 1347–48 (9th Cir.1992)(finding that city manager's decision not to overrule fire chief, but to hire counsel to defend fire chief in arbitration was not ratification). The common thread in these cases is that in addition to having knowledge of the subordinate's action, the final policymaker must somehow actively assist the subordinate or participate in administering the action as policy. It is essential to remember that the purpose of requiring approval by the final policymaking authority is to prevent the application of *respondeat superior* liability in the context of municipalities. *Weisbuch v. County of Los Angeles,* 119 F.3d 778, 781–82 (9th Cir.1997); *see Monell,* 436 U.S. at 691, 98 S.Ct. 2018.

Defendant argues that it took no official action upon Owen's decision, and therefore cannot be found to have ratified Owen's decision as policy. The Board acts through official votes, recorded in the official minutes, and the votes are not allowed to be secret or written ballots. Isle of Wight County School Board, *Voting Method BDDF* (revised July 11, 2002), *in* School Board Policy Manual, *available at* http://www.iwcs.k12.va.us/policy/BDDF.html. No vote taken in a closed meeting will be effective unless the Board reconvenes in open meeting and takes a vote on the same matter as reasonably identified. Isle of Wight County School Board, *Closed Meetings BDC* (revised August 12, 2004), *in* School Board Policy Manual, *available at* http://www.iwcs.k12.va.us/policy/BDC.html. Citizens are allowed to address the Board at any regular meeting, although the Board requests notification three days in advance for placement on the agenda. Isle of Wight County School Board, *Public Participation at School Board Meetings KD* (revised Aug. 12, 2004), *in* School Board Policy Manual, *available at* http://www.iwcs.k12.va.us/policy/KD.html.

■ Defendant argues that Plaintiff did not follow the proper procedure for raising a complaint to the school board level, in that Plaintiff never asked for Owen's decision to be overturned, did not file a formal appeal, and did not request three days in advance to be placed on the agenda. (Dep. McPherson at 22–27; 33–38, 134.) Even if Plaintiff did satisfy the procedural requirements for appealing Owen's decision, Plaintiff did not seek resolution by official action of the Board. The Board acts through votes. The opinions of the individual members of the Board, even as given at a meeting of the Board, do not constitute the opinion of the Board, itself. For the Court to find that there was Board ratification of Principal Owen's actions, there must have been some cognizable action taken by the official body that is the school board. Plaintiff has not provided any evidence that the Board took any action on this matter. The Board did not participate with Owen in reviewing the lyrics to Plaintiff's song or any other student presentation for the graduation. Plaintiff's airing of grievances before the board members is not enough to satisfy the requirements of ratification. While it might be clear how the Board would have voted had it done so, the fact that the Board did not act is the determining factor in this analysis. Any concern that the Board might avoid liability by refusing to vote in such instances is adequately addressed by the "custom and usage" portion of the *Praprotnik* analysis. The Board's repeated tacit approval of such actions would rise to the level of policy through custom and usage. As noted above, Plaintiff has not shown any facts that would support a finding of a custom or usage in the school district. Defendant did not ratify the decision and basis of Principal Owen's decision, therefore no policy has been made for the school district. To hold Defendant liable under

§ 1983 in this case would be to do so on a theory of *respondeat superior*, which is clearly not permissible at law. No genuine issue of material fact exists to be resolved which would allow Plaintiff to proceed. Accordingly, Defendant is entitled to summary judgment on both claims.

## C. Free Speech Claim on the Merits

■ Even assuming, *arguendo*, that Defendant ratified Owen's decision and his basis for that decision, so that Plaintiff could bring suit against Defendant pursuant to 42 U.S.C § 1983 for a violation of her First Amendment right to free speech, Plaintiff does not allege facts sufficient to sustain a cause of action under the First Amendment.[11]

"High school graduation ceremonies have not been regarded, either by law or tradition, as public fora where a multiplicity of views on any given topic, secular or religious, can be expressed and exchanged." *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1478 (3d Cir.1996); *see also Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 822 (5th Cir.1999), *aff'd* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)(noting that the typical school tightly controls the graduation ceremony, preventing it from being considered anything but a nonpublic forum); *Brody v. Spang*, 957 F.2d 1108, 1119–20 (3d Cir.1992)(finding that school control of the graduation ceremony dictates the ceremony be considered a nonpublic forum). Neither party disagrees that Principal Owen maintained a high degree of control over the program for the graduation ceremony; that is the essence of Plaintiff's complaint. Therefore, it cannot be said that the WHS graduation ceremony was anything but a nonpublic forum. *See Black Horse Pike* at 1478–79 (discussing the relevance of degree of control to determining the type of forum); *see also Lee v. Weisman*, 505 U.S. 577, 597, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). The government has the right in a nonpublic forum to make distinctions based on the subject matter of the presentation, so long the distinctions "are reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Even if the Court found that Defendant ratified Principal Owen's decision, Defendant had a reasonable basis for prohibiting religious presentations at a school-sanctioned ceremony; to wit, prevention of a violation of the Establishment Clause.[12] *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

Even if the Court reached the unprecedented conclusion that the graduation ceremony was a public forum, Defendant has a compelling interest in prohibiting reli-

---

**11.** The Court declines to address Plaintiff's Equal Protection argument even *arguendo*, because it is clear that the Defendant's lack of knowledge of the contents of the other speeches fails to satisfy even the threshold requirements for ratification. *See Christie*, 176 F.3d at 1239.

**12.** "The Establishment Clause of the First Amendment, made applicable to the states and their political subdivisions through the Fourteenth Amendment, commands that the Government 'shall make no law respecting an establishment of religion.'" *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 296 (4th Cir.2004). "In the course of adjudicating specific cases, this Court [the United States Supreme Court] has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization...." *County of Allegheny v. ACLU*, 492 U.S. 573, 590, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). Having reviewed the lyrics of "The Prayer," the Court finds that Defendant had a genuine concern that Plaintiff's performance of the song at the graduation ceremony might constitute violation of the Establishment Clause of the United States Constitution.

gious presentations at graduation which would allow the Board to enforce a content-based exclusion. *See Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948 (explaining that even in a public forum the government may restrict speech if the regulation is narrowly tailored to meet a compelling state interest). This case is similar to that of *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092 (9th Cir. 2000), *cert. denied sub nom. Niemeyer v. Oroville Union High Sch. Dist.,* 532 U.S. 905, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001). In *Cole,* the school board had adopted a policy requiring the principal to review all student presentations to be given at graduation for offensive or denominational content. *Id.* at 1096. The policy did not specify which types of content were prohibited, but faculty at the school repeatedly told the students to make speeches "inclusive of all beliefs." *Id.* One of the students in *Cole,* Niemeyer, was co-valedictorian. *Id.* The other student, Cole, had been elected by the student body to deliver an invocation. *Id.* Despite a request from the principal to change their presentations to be nondenominational, both Cole and Niemeyer refused to make the necessary changes. *Id.* The principal rejected both speeches, and consulted with both the superintendent and the school district's legal counsel, who both agreed with the principal's decision. *Id.* Niemeyer attempted to deliver his speech at graduation in spite of the principal's decision, but the principal prevented Niemeyer from speaking. *Id.* at 1097. The students brought suit for injunctive, declaratory, and monetary relief. *Id.* The United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") found that the free speech and free exercise rights of the students had not been infringed, and the school had acted properly to avoid a violation of the Establishment Clause. *Id.* at 1101–04 n. 9. The United States Supreme Court denied certiorari.

The *Cole* Court relied upon the fact that the decision not to allow the students to speak was necessary to avoid violating the Establishment Clause, and that avoiding such a violation is a compelling state interest. *Id.* at 1101 (citing *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *Lee,* 505 U.S. at 597, 112 S.Ct. 2649; *Rosenberger v. Rector and Visitors,* 515 U.S. 819, 837, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Pinette,* 515 U.S. at 761–62, 115 S.Ct. 2440; *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)). The *Cole* Court found that because the school district had control over the entire graduation ceremony, including the student speakers through review of the students' speeches, the student speeches would be considered approved by the government. *Cole,* 228 F.3d at 1103. Any religious speech under those circumstances would be considered government endorsement of the religious message. *Id.* It was because of the district's review and approval process involved in *Cole* that the Ninth Circuit found that the inclusion of a religious message would have violated the Establishment Clause.

Plaintiff makes much of the guidance document issued by the Department of Education pursuant to the amendment of section 9524 of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 7904, by the No Child Left Behind Act of 2001, 20 U.S.C. § 6301. *See generally,* U.S. DEPT. OF EDUC., GUIDANCE ON CONSTITUTIONALLY PROTECTED PRAYER IN PUBLIC ELEMENTARY AND SECONDARY SCHOOLS (Feb. 7, 2003), *available at* http://www.ed.gov/policy/gen/guid/religionandschools/prayer_guidance.html. However, even the guidance document is in agreement with the *Cole* Court in acknowledging that "where school officials determine or substantially control the content of what is expressed, such speech is attribut-

able to the school and may not include prayer or other specifically religious (or anti-religious) content." *Id.* It is clear in this instance, just as in *Cole,* that the principal and teachers maintained control of the content of the graduation ceremony. It is this very control of which the Plaintiff complains. Plaintiff's song was not the only performance reviewed by school officials. Scott reviewed the contents of the other student-speakers' speeches. (Dep. Owen at 45–48; Dep. Robertson at 32–33; Dep. Scott at 101–04, 113.) This *might* be a different case if the school board was being sued for allowing Plaintiff to sing a religious song where the school had a "hands-off" policy towards student speakers. Providing schools with protection and guidance in that sort of situation appears to be the goal of the portions of the guidance document upon which Plaintiff relies so heavily. Unfortunately for Plaintiff, the Court is not confronted with that set of facts. Plaintiff has presented no evidence and made no allegations that would raise a genuine issue of material fact as to whether she was entitled to damages for a violation of her First Amendment right to free speech. Accordingly, Defendant would be entitled to Summary Judgment even if the Board ratified Owen's decision as policy.

## D. Subject Matter Jurisdiction

■■■■■ The Court must raise issues of subject matter jurisdiction *sua sponte* if it appears at any time that further exercise of Court's jurisdiction may be improper. *See e.g., Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 608, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978). Plaintiff's Complaint pleaded federal question

"arising under" jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.[13] The existence of subject matter jurisdiction is determined under the "well pleaded complaint rule." *Gully v. First Nat'l Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936) (Cardozo, J.). To establish federal question jurisdiction, Plaintiff bears the burden of demonstrating that a substantial question of federal law is raised by her complaint. A mere allegation that a federal statute has been violated is not sufficient. *See e.g., Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148 (4th Cir.1994). When a federal claim is merely one of several alternative theories of recovery, "arising under" jurisdiction does not exist. *Mulcahey,* 29 F.3d at 154 (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 810, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)("a claim supported by alternative theories in the complaint may not form the basis for [federal question jurisdiction] unless [federal law] is essential to each of those theories.")) As the Fourth Circuit observed, "*Christianson* teaches us that, if a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist." *Id.* Therefore, having granted summary judgment against Plaintiff on all the federal claims, the Court finds that it does not have original jurisdiction over the remaining claims asserted in Plaintiff's complaint, and that these claims should be raised by Plaintiff in the courts

---

**13.** 28 U.S.C. § 1367(c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district,

court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

of the Commonwealth of Virginia. The Court finds *sua sponte* that it lacks subject matter jurisdiction to entertain this suit any further, and the Court declines to exercise supplemental jurisdiction on those same grounds. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, the Court need not address the Motions of Defendant or Plaintiff for Summary Judgment on the state claims, and the remainder of this action is **DISMISSED**.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment on Plaintiff's federal claims is **GRANTED**. Plaintiff's Motion for Partial Summary Judgment is **DENIED**. Plaintiff's remaining state claims are **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the parties.

**IT IS SO ORDERED.**