Roy **WALKER** and Shellie **Walker, Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 04–155L.

United States Court of Federal Claims.

Oct. 31, 2005.

---

8. *See generally* Compl. ¶ V.C (referencing the UCC and contracts); Mem. at 1 ("pursuant to Rules 57").

Lyman Daniel Bedford, McQuaid, Bedford & Van Zandt, L.L.P., San Francisco, California, counsel for Plaintiffs.

Kristine Sears Tardiff, United States Department of Justice, Washington D.C., counsel for Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING, IN PART, PLAINTIFFS' MOTION TO RECONSIDER, CERTIFYING QUESTION OF STATE LAW TO THE SUPREME COURT OF NEW MEXICO, AND DENYING THE GOVERNMENT'S MOTION TO DISMISS

BRADEN, Judge.

### RELEVANT FACTS [1]

Plaintiffs Roy and Shellie Walker own and raise cattle on the Walker Ranch in Grant

---

[1] The relevant facts recited herein also were set forth in *Walker v. United States*, 66 Fed.Cl. 57 (2005) and derived from: the February 5, 2004 Complaint ("Compl."); the Government's May 4, 2004 Motion to Dismiss ("Gov't Mot. to Dismiss") and exhibits thereto ("Def.Ex."); Plaintiffs' August 16, 2004 Opposition ("Pl.Opp."); an August 16, 2004 Declaration of Ms. Shellie Walker ("Walker Decl."); and the Government's August 18, 2004 Reply ("Gov't Reply"). In addition, Plaintiffs' June 17, 2005 Motion for Reconsideration ("Mot. for Recon."); the Government's August 1, 2005 Opposition ("Gov't

County, New Mexico. *See* Walker Decl. ¶ 27; *see also* Compl. ¶¶ 4, 12–13. The Walker Ranch consists of 40 acres of land that is the base property[2] for two grazing allotments[3] in the Gila National Forest administered by the United States Forest Service ("U.S. Forest Service").[4] *See* Compl. ¶¶ 8–9. The Walkers contend that they possess water, access, and forage rights originating in the Gila National Forest that the Government has taken without just compensation. *See* Compl. ¶¶ 8–9, 32–33; Mot. for Recon. at 5–7.

On March 23, 1995, the U.S. Forest Service issued the Walkers a Ten Year Term Grazing Permit, No. 06–1099 ("grazing permit") that allowed year-long grazing of 265 head of cattle and eight horses on the Hot Springs and Cold Springs Allotments ("Allotments") covering approximately 17,826 acres within the Gila National Forest.[5] *See* Walker Decl. ¶ 30; *see also* Def. Ex. 1 (grazing permit); Def. Ex. 2 (Declaration of District Ranger Gerald Engel ("Engel Decl.")) ¶ 6. After a number of verbal and written exchanges between the U.S. Forest Service and the Walkers regarding conditions on the Allotments and whether the Walkers were required to comply with orders issued by the U.S. Forest Service, the U.S. Forest Service partially cancelled the Walkers' grazing permit on October 4, 1996. Def. Ex. 15 at 47–48. On October 29, 1996, Roy Walker responded by letter, again asserting that the Walkers owned all surface rights on the Allotments and were not required to have a permit to graze cattle thereon. *See* Def. Ex. 16 at 50. On November 8, 1996, the Walkers' grazing permit was cancelled in its entirety and the Walkers were directed to remove all remaining livestock from the Allotments. *See* Def. Ex. 17 at 51; *see also* Def. Ex. 2 (Engel Decl.) ¶ 14; Walker Decl. ¶ 31. The Walkers did not file an adminis-

trative appeal. *See* Def. Ex. 2 (Engel Decl.) ¶ 15. Instead, the Walkers continued to assert that they owned the Allotments and were not required to have a permit to graze their cattle. *See* Def. Ex. 18 at 55; *see also* Walker Decl. ¶ 31. After the permit was cancelled, the Walkers continued to graze 265 head of cattle on the Allotments. *See* Walker Decl. ¶¶ 31–32; *see also* Def. Ex. 2 (Engel Decl.) ¶ 16.

On May 7, 1997, the United States ("the Government") filed a Complaint in the United States District Court for the District of New Mexico ("United States District Court") alleging trespass and seeking damages, unpaid grazing fees, and an injunction enjoining the Walkers from continuing to graze livestock on the Allotments. *See United States v. Roy Dee Walker and Shellie Ann Walker,* Case No. Civ. 97–641 (D.N.M., filed May 7, 1996) ("United States District Court action"); *see also* Def. Ex. 19 ¶¶ 1–6; Walker Decl. ¶ 33.

On June 9, 1997, the Walkers filed an Answer in the United States District Court asserting ownership of all surface rights on the Allotments and a Counterclaim for Just Compensation under the Fifth Amendment to the United States Constitution. *See* Def. Ex. 20 at 78–80; *see also* Walker Decl. ¶ 34. On August 26, 1997, the Government filed a Motion to Dismiss the Counterclaim. *See* Def. Ex. 21 at 83. On October 7, 1997, the Walkers also filed a Motion to Dismiss. *Id.* On October 8, 1997, the Government filed a Motion for Summary Judgment. *Id.* During this period, the Walkers continued to graze 265 head of cattle on the Allotments. *See* Walker Decl. ¶¶ 30, 32, 37.

On January 7, 1998, the United States District Court issued a Memorandum Opin-

---

Opp."); and Plaintiffs' August 30, 2005 Reply ("Pl.Reply") are referenced herein.

2. "Base property" is "land and improvements owned and used by the permittee for a farm or ranch operation and specifically designated by him to qualify for a term grazing permit." 36 C.F.R. § 222.1(b)(3).

3. An allotment is a "designated area of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1).

4. The Chief of the U.S. Forest Service will "develop, administer and protect the range resources and permit and regulate the grazing use of all kinds and classes of livestock on all National Forest System lands and on other lands under Forest Service control." 36 C.F.R. § 222.1(a).

5. Permit No. 06–1099 superceded the grazing permits the Walkers purchased from the Olivers and the Dominguezes. *See* Def. Ex. 1 (grazing permit).

ion and Order denying the Walkers' Motion to Dismiss; dismissing the Walker's Counterclaim, without prejudice; and granting the Government's Motion for Summary Judgment. *See United States v. Roy Dee Walker and Shellie Ann Walker*, Case No. Civ. 97–641, slip op. at 6–7 (D.N.M., filed Jan. 7, 1998) ("Def.Ex. 21"). Therein, the United States District Court held:

> There is no legal basis for [the Walkers'] argument that they hold title to the "surface estate" of the Cold/Hot Springs [A]llotment. I find that [the Walkers] have no legal title to the Cold/Hot Springs [A]llotment and that their continued grazing of cattle upon the Cold/Hot Springs [A]llotment within the Gila National Forest without a permit constitutes a trespass.

Def. Ex. 21 at 87.

With respect to the Walkers' Counterclaim, the United States District Court determined that:

> [The Walkers' counterclaim must be] heard in the [United States] Court of Federal Claims [because it] seeks damages in excess of $670,050.00 plus other unenumerated economic losses as well as injunctive relief against [the Government]. Because this far exceeds the amount stated in the Tucker Act, [the United States District Court] has no jurisdiction ... unless [the Walkers] stipulate that their claims will not exceed $10,000.

*Id.* at 88 (citations omitted).

On February 27, 1998, a Final Judgment was issued by the United States District Court denying the Walkers' Motion to Dismiss; dismissing the Walkers' Counterclaim, without prejudice; and granting the Government's Motion for Summary Judgment to enjoin the Walkers from grazing cattle without a permit and require the Walkers to remove all livestock from the Allotments, no later than June 30, 1998. *See* Def. Ex. 22 at 90–91; *see also* Walker Decl. ¶ 38. The Walkers were assessed a $13,411.84 fine for unlawful grazing. *See* Def. Ex. 22 at 90–91. The Final Judgment, however, emphasized that: "[n]othing herein will be deemed a waiver of [the Walkers'] right to appeal this final judgment as to the liability for trespass, or to file a takings claim in the [United States] Court of Federal Claims with respect to the facts underlying this trespass action." *Id.* at 91. The Walkers, however, did not appeal the Final Judgment and removed all livestock from the Allotments by the June 30, 1998 deadline. *See* Walker Decl. ¶ 39.

## PROCEDURAL BACKGROUND

On February 5, 2004, Plaintiffs filed a Complaint in the United States Court of Federal Claims asserting violations of the Just Compensation Clause of the Fifth Amendment to the United States Constitution ("Just Compensation Claim") and a claim for compensation, pursuant to 43 U.S.C. § 1752(g). *See* Compl. ¶¶ 30–38.

The Just Compensation claim alleged a taking of: water, access, and rights on the Allotments through physical appropriation of the water and a denial of all economic uses of the water, including a deprivation of all reasonable, investment-backed expectations; the Walker Ranch, in that the water, forage, and grazing rights are essential to ranch operations, depriving Plaintiffs of all economically viable use thereof and all reasonable, investment-backed expectations; and the Plaintiffs' preference grazing rights in the Allotments. *See* Compl. ¶¶ 32–34.

On May 4, 2004, the Government filed a Motion to Dismiss arguing, in relevant part, that "[a]ll of plaintiff's claims are barred by the applicable six year statute of limitations, 28 U.S.C. § 2501, because such claims accrued when plaintiffs' term grazing permit was cancelled by the Forest Service in November 1996, which is nearly 7 ½ years prior to the filing of their Complaint on February 5, 2004." Gov't Mot. To Dismiss at 1. On August 16, 2004, Plaintiffs filed an Opposition arguing that their Just Compensation claims did not accrue until June 30, 1998, the date the United States District Court's injunction became effective. *See* Pl Opp. at 9–20 (initially indicating February 27, 1998, the date the District Court issued its opinion, but arguing June 30, 1998, the date the District Court's injunction became effective). On August 18, 2004, the Government filed a Reply.

\* \* \* \* \* \*

On December 16, 2004, this case was reassigned to the undersigned judge. On May 31, 2005, the court issued a Memorandum Opinion and Order granting the Government's Motion to Dismiss regarding: the first cause of action set forth in paragraphs 1–32 of the Complaint for compensation for the alleged taking of the Walkers' property interests in the Allotments; the third cause of action set forth in paragraphs 1–31 and 34 of the Complaint for compensation for the alleged taking of Permit No. 06–199; and the fourth cause of action set forth in paragraphs 1–29 and 35–38 of the Complaint for compensation, pursuant to 43 U.S.C. § 1752(g). *See Walker*, 66 Fed.Cl. at 65–68 (holding that collateral estoppel barred relitigation of the existence of the property interest alleged in the first cause of action). The court held, however, that the second cause of action in paragraphs 1–31 and 33(A)–33(E) of the Complaint survived the Government's Motion to Dismiss. *Id.* at 67.

On June 17, 2005, Plaintiffs filed a Motion for Reconsideration. On August 1, 2005, the Government filed an Opposition. On August 30, 2005, Plaintiffs filed a Reply.

## DISCUSSION

### A. Standard For Reconsideration.

■ United States Court of Federal Claims Rule ("RCFC") 59 provides that "reconsideration may be granted ... for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a)(1). The decision to grant a motion for reconsideration is within the court's discretion. *See Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990) (holding that "the decision whether to grant reconsideration lies largely within the discretion of the [trial] court"). To prevail, the moving party must identify a manifest error of law or mistake of fact. *See Coconut Grove Entm't, Inc. v. United States*, 46 Fed.Cl. 249, 255 (2000) (holding that a movant must "point to a manifest error of law or mistake of fact").

### B. Arguments Of The Parties.

#### 1. The Plaintiffs' Motion For Reconsideration.

Plaintiffs seek reconsideration of the court's decision that the final judgment in *United States v. Roy Dee Walker and Shellie Ann Walker*, Case No. 97–641, slip op., (D.N.M., filed Jan. 7, 1998), collaterally estopped further litigation of Plaintiffs' of water, access, and forage rights. Plaintiffs argue that collateral estoppel does not apply to those rights, because the United States District Court only determined that Plaintiffs, as a matter of New Mexico law, had no property interest in the surface estate of the Allotments. *See* Mot. for Recon. at 2–3, 6.

#### 2. The Government's Opposition To Plaintiffs' Motion For Reconsideration.

The Government responds that the alleged property interests at issue were fully litigated in the United States District Court trespass action, in which the District Court held, as a matter of New Mexico law, that Plaintiffs had no property interest in the Allotments at issue and, therefore, the Plaintiffs have no basis to assert a Just Compensation Claim. *See* Gov't Opp. at 3–5. The Government further argues that if Plaintiffs had other water, access, and forage rights, then the United States District Court would have found Plaintiffs' continued use of the Allotments without a permit to be a trespass, because such rights are uses of an allotment and regulated by permit. *Id.* at 4 ("[T]he [United States] District Court's decision necessarily found that no such rights existed. If the Plaintiffs did possess such property rights and those property rights included the right to use public lands (the Allotments) without a permit, then Plaintiffs' actual use of the Allotments without a permit would not have constituted a trespass.").

### C. The Court's Disposition Of The Plaintiffs' Motion For Reconsideration.

■ The court erred in holding that Plaintiffs are "collaterally estopped from asserting their Just Compensation claims in the United States Court of Federal Claims, because the

United States District Court's judgment that the Walkers did not have legal title to the [A]llotments is now final and binding on this court." *Walker*, 66 Fed.Cl. at 66. This error arose from the court's mistaken belief that "for the Walkers to bring a claim based on the taking of the surface rights on the [A]llotments, including water, forage, and access rights, the Walkers must first establish ownership of a property interest in the surface estate of the [A]llotments at the time of the alleged taking." *Id.* On reconsideration, the court has learned that the water, access, and forage rights that the Plaintiffs claim to possess, to the extent they are recognized by New Mexico law, are legally distinct from the surface estate rights addressed by the United States District Court's prior decision. Accordingly, collateral estoppel does not bar Plaintiffs from alleging ownership of compensable water, access and forage rights in this case. *See Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983) (holding that for collateral estoppel to apply the issues to be concluded must be identical to those involved in the prior action).

1. **The Law Of The State Of New Mexico Determines The Nature Of The Plaintiffs' Alleged Property Interests.**

 Prior to the establishment of the Gila National Forest between 1899 and 1910, the areas now known as the Hot and Cold Springs Allotments were public land located in the Territory of New Mexico. *See Mimbres Val. Irr. Co. v. Salopek*, 90 N.M. 410, 564 P.2d 615, 617 (1977), *aff'd* 438 U.S. 696, 718, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (discussing the establishment of the Gila National Forest). The fact that the Allotments were public land is significant because Congress repeatedly has enacted legislation specifying that private water rights on public land are to be governed by state and local law and custom, not federal law.

Congress enacted the Mining Act of 1866 to protect vested water rights on public land "recognized and acknowledged by local custom, laws, and the decisions of courts." *Andrus v. Charlestone Stone Products Co., Inc.*, 436 U.S. 604, 612–13, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) (discussing Congress' early regulation of federal land) (citing 30 U.S.C. § 51).[6] This Act, however, "was not itself a grant of water rights pursuant to federal law. Instead, as [the United States Supreme Court] observed, the [Mining] Act was 'a voluntary recognition of a pre-existing right of possession, constituting a valid claim to continued use.' Congress intended 'to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition.' " *California v. United States*, 438 U.S. 645, 656, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) (quoting *United States v. Rio Grande Dam & Irrig. Co.*, 174 U.S. 690, 705, 19 S.Ct. 770, 43 L.Ed. 1136 (1899) and *Basey v. Gallagher*, 20 Wall. 670, 87 U.S. 670, 22 L.Ed. 452 (1875)).

Four years later, in the Act of July 9, 1870, 16 Stat. 218, Congress once again ensured "occupants of federal public land would be bound by state water law, by providing that 'all patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights.' The effect of the 1866 and 1870 Acts was not limited to rights previously acquired. 'They reach[ed] into the future as well, and *approve[d] and confirm[ed] the policy of appropriation for a beneficial use*, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test

---

**6.** The Mining Act of 1866 provides:

Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right-of-way for the construction of ditches and

canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

30 U.S.C.A. § 51 (2005) (R.S. § 2339 derived from Act July 26, 1866, c. 262, § 9, 14 Stat. 253).

and measure of private rights in and to the non-navigable waters on the public domain.' " *California*, 438 U.S. at 656 n. 11, 98 S.Ct. 2985 (quoting *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 155, 55 S.Ct. 725, 79 L.Ed. 1356 (1935)) (emphasis added); *see also Andrus*, 436 U.S. at 613, 98 S.Ct. 2002 (discussing Congress' early regulation of federal land) (citing 31 U.S.C. § 52).[7]

In 1877, Congress enacted the Desert Land Act, ch. 107, 19 Stat. 377, which "effected a severance of all water upon the public domain, not theretofore appropriated, from the land itself." *California Oregon Power Co.*, 295 U.S. at 158, 55 S.Ct. 725. As the United States Supreme Court explained:

*Congress' purpose was not to federalize the prior-appropriation doctrine already evolving under local law.* Quite the opposite: What we hold is that following the act of 1877, if not before, all non-navigable waters then a part of the public domain became *publici juris*, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since Congress cannot enforce either rule upon any state, the full power of choice must remain with the state. The *Desert Land Act* does not bind or purport to bind the states to any policy. It *simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation,* and seeks to remove what otherwise might be an impediment to its full and successful operation.

*California*, 438 U.S. at 658, 98 S.Ct. 2985 (internal quotations and citations omitted) (emphasis added).

Likewise, in *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937), the United States Supreme Court clarified that:

The federal government, as owner of the public domain, had the power to dispose of the land and water composing it together or separately; and by the Desert Land Act of 1877 (c. 107, 19 Stat. 377), if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately. *Acquisition of the government title to a parcel of land was not to carry with it a water right; but all nonnavigable waters were reserved for the use of the public under the laws of the various arid-land states.*

*Id.* at 95, 57 S.Ct. 412 (emphasis added) (citing *California Oregon Power Co.*, 295 U.S. at 162, 55 S.Ct. 725).

The Gila National Forest was established by separate presidential proclamations, dated March 2, 1899, July 2, 1905, February 6, 1907, June 18, 1908 and May 9, 1910, and authorized under the Creative Act of 1891, 16 U.S.C. § 471. *See Mimbres Val. Irr. Co.*, 564 P.2d at 617 (discussing the establishment of the Gila National Forest and holding that the United States, in setting aside the Gila National Forest from other public lands, did not reserve the use of the waters of the Rio Mimbres for purposes of recreation, aesthetics, wildlife preservation, or cattle grazing). Each proclamation authorized the removal of land from the public domain and dedicated that land to the Gila National Forest. Although these reservations of public land rendered the Mining Acts of 1866 and 1870 and the Desert Land Act of 1877 inapplicable to subsequent appropriations of water and other state created or recognized rights, they did not trump existing or recognized rights. *See Federal Power Commission v. Oregon*, 349 U.S. 435, 446–48, 75 S.Ct. 832, 99 L.Ed. 1215 (1955) (holding the Mining Acts of 1866 and 1870 and the Desert Land Act of 1877 inapplicable once land is reserved from the public domain). Moreover, while the Mining

---

7. The Mining Act of 1870 provided:
 All patents granted, or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by section 51 of this title.
 30 U.S.C.A. § 52 (2005) (R.S. § 2340 derived from Act July 9, 1870, c. 235, § 17, 16 Stat. 218).

Acts of 1866 and 1870 and the Desert Land Act of 1877 were no longer applicable, the Organic Administration Act of 1897, 30 Stat. 36, extended the control of state water law over non-reserved water within the boundaries of national forests. *See United States v. New Mexico*, 438 U.S. 696, 717 n. 24, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978) (discussing implied-reservation-of-water doctrine and the effect of the Organic Administration Act of 1897 providing that "[a]ll waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder") (citing 16 U.S.C. § 481 (2005) (June 4, 1897, c. 2, § 1, 30 Stat. 36)).

Therefore, as a matter of federal law, the law of the Territory of New Mexico and the law of the State of New Mexico, local customs, laws, and the decisions of courts, governs the determination, validity, scope, and nature of Plaintiffs' alleged water,[8] access, and forage rights in the Allotments at issue in the Gila National Forest, including the appropriation of non-reserved water [9] on land reserved from the public domain.

### 2. The Law Of The State Of New Mexico Recognizes Water Rights As An Independent Property Interest.

■ Contrary to the court's initial understanding, under New Mexico law, the water rights alleged in the Complaint are separate and independent property interests, the ownership of which is not dependent on possessing an interest in an associated surface estate.

The doctrine of prior appropriation existed under Mexican sovereignty at the time the Territory of New Mexico was ceded to the United States by the Treaty of Guadalupe Hidalgo in 1848. *See Yeo v. Tweedy*, 34 N.M. 611, 286 P. 970, 972–73 (1929); *see also Mur-*

*phy v. Kerr*, 296 F. 536, 540–45 (D.N.M. 1923). Therefore, when the nascent territorial legislature adopted the common law in 1876, it did not adopt riparian rights. *See Yeo*, 286 P. at 972 (discussing the Territory of New Mexico's adoption of the common law in 1876); *see also Colorado v. New Mexico*, 459 U.S. 176, 179 n. 4, 103 S.Ct. 539, 74 L.Ed.2d 348 (1982) (discussing the difference between the riparian and appropriation doctrines). Subsequently, the Supreme Court of New Mexico held that "the sweeping statute adopting the common law … as the rule of practice and decision, did not result in the adoption of rules inapplicable to our conditions, circumstances, and necessities, and subversive of rights long since vested and recognized." *Yeo*, 286 P. at 972. In 1911, when the New Mexico Constitution was enacted, prior common law specifically was recognized:

> The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right.

N.M. Const. art. XVI, § 2; *see also State Game Commission v. Red River Valley Co.*, 51 N.M. 207, 182 P.2d 421, 427 (1945) (holding that "this constitutional provision is only 'declaratory of prior existing law,' always the rule and practice under Spanish and Mexican dominion").

Therefore, as a matter of law in the State of New Mexico, an "appropriation of water" consists of the taking or diversion of water from some natural stream, or other source of water supply, with intent to apply it to some beneficial use, which intent is consummated within a reasonable time by the actual application of all of the water to the use designed, or to some other useful purpose. *See Snow v. Abalos*, 18 N.M. 681, 140 P. 1044, 1047–

---

8. Although the Complaint alleges that the Walker Ranch has been in operation since at least 1897, the priority date of Plaintiffs' alleged water rights is not provided. *See* Compl. ¶ 17.

9. Under the "implied-reservation-of water doctrine," the United States did not reserve water

for stockwatering purposes when it withdrew lands from the public domain to establish the Gila National Forest. *See United States v. New Mexico*, 438 U.S. 696, 716, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978).

1050 (1914). An appropriator of water, however, does not acquire a right in New Mexico to specific water, but only the right to take a given quantity of water from a specific body of water for a specified purpose. *Id.* at 1048. Therefore, once appropriated, water "became a constitutionally protected property interest. It could be sold, leased, or transferred in other ways. It was a usufructurary right, or a right to use, and was a protected property right." Norman K. Johnson and Charles T. DuMars, 29 Nat. Resources J., 347, 351 (1989); *see also* N.M. Stat.1978, § 72–5–17–24 (under New Mexico law, an owner may: assign a water right; change the purpose for which the water was appropriated; change the point of diversion; and/or sell excess water to which the owner is entitled).

Under New Mexico law, this right is further considered to be real property:

> A water right is property and in fact it is held to be real property by most authorities. 'It is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such property.'

*Posey v. Dove*, 57 N.M. 200, 257 P.2d 541, 547 (1953) (citing *New Mexico Products Co.*

*v. New Mexico Power Co.*, 42 N.M. 311, 77 P.2d 634, 641 (1937)) (quoting 2 Kinney on Irrigation and Water Rights (2d ed.) p. 1328); *see also Murphy v. Kerr*, 296 F. 536, 541 (D.N.M.1923) (discussing the reasons why, under the prior appropriation doctrine, water rights are real property independent from any ownership of land and use or mode of enjoyment), *aff'd,* 5 F.2d 908 (8th Cir. 1925).[10]

In sum, appropriative water rights, like those alleged in the Complaint, are recognized under New Mexico law as independent property interests, the ownership of which is not dependent upon possessing an interest in a related surface estate. *See KRM, Inc. v. Caviness*, 925 P.2d at 10 (N.M.Ct.App.1996) ("Under the appropriation doctrine, the right to use water is considered a property right which is separate and distinct from the ownership of land."). Therefore, the bare allegations in the Complaint that the Government has taken the Plaintiffs' water rights is sufficient, at this juncture, to withstand a Motion to Dismiss. *See Adams v. United States*, 391 F.3d 1212, 1218 (Fed.Cir.2004) (holding that dismissal for failure to state a claim under Rule 12(b)(6) is proper only when a plaintiff can prove no set of facts in support of his

---

10. The "[t]heory of water as an independent property right is subject to a legislative exception for irrigation. The statutory exception for irrigation is based on judicial recognition of the general custom in New Mexico relating to waters used for irrigation." *KRM, Inc. v. Caviness*, 122 N.M. 389, 925 P.2d 9, 11 (citing *Snow v. Abalos*, 18 N.M. 681, 140 P. 1044, 1049 (1914)). Under this exception irrigation water is appurtenant to a particular parcel of land. *Id.* Under New Mexico law, however, irrigation water rights may be severed from the land to which they are appurtenant:

> All water used in this state for irrigation purposes, except as otherwise provided in this article, shall be considered appurtenant to the land upon which it is used, and the right to use it upon the land shall never be severed from the land without the consent of the owner of the land, but, by and with the consent of the owner of the land, all or any part of the right may be severed from the land, simultaneously transferred and become appurtenant to other land, or may be transferred for other purposes, without losing priority of right theretofore established, if such changes can be made without detriment to existing water rights and are not contrary to conservation of water within the state and not detrimental to the public welfare

of the state, on the approval of an application of the owner by the state engineer. Publication of notice of application, opportunity for the filing of objections or protests and a hearing on the application shall be provided as required by Sections 72–5–4 and 72–5–5 NMSA 1978.

N.M. Stat. § 72–5–23 (1978).

A New Mexico trial court has suggested a similar case law exception exists for water rights used for stock watering:

> New Mexico case law would also support expanding the statutory exception to include water used on the land for domestic purposes, including watering livestock, or where the right to continue to use the water on the land is indispensable to the enjoyment of the land.

*KRM, Inc.*, 925 P.2d at 11 (citing *First State Bank of Alamogordo v. McNew*, 33 N.M. 414, 269 P. 56, 62–63 (1928)).

Regardless of whether New Mexico case law supports such an exception, the water rights alleged in this case constitute independent property rights, because under the laws of the State of New Mexico, unity of title, which has never existed in this case, is a prerequisite for appurtenancy. *See First State Bank of Alamogordo*, 269 P. at 62–67 (discussing appurtenancy and holding unity of title is a prerequisite thereof).

claim which would entitle him to relief); *see also* RCFC 12(b)(6).

### 3. The Law Of The State Of New Mexico Recognizes A Right–Of–Way For The Maintenance And Enjoyment Of Vested Water Rights.

The law of the State of New Mexico also recognizes a "right of way and other instrumentalities for the maintenance and enjoyment" of water rights protected under the Mining Act of 1866.[11] *See First State Bank of Alamogordo,* 269 P. at 66. Possession of a right-of-way for the maintenance and enjoyment of a water right is not dependent upon ownership of the underlying surface estate. *Id.* at 66 (1928) (treating a right-of-way for the maintenance and enjoyment of a water right as an independent property interest). While ditch rights-of-way are treated as easements and are strictly construed, the law of the State of New Mexico appears to be silent on the scope of rights-of-way and other instrumentalities for the enjoyment of water rights protected under the Mining Act of 1866. *See Posey,* 257 P.2d at 549 (strictly construing an easement allowing access to a water right).

Similarly, the Mining Act of 1866, which protects such rights-of-way to the extent they are recognized and acknowledged by local customs, laws, and judicial decisions, is silent on the scope of such rights-of-way. *Id.* The United States Court of Federal Claims, however, has observed that federal statutes "with similar purposes to the 1866 Act incorporate a consistent 50 foot right-of-way for ditches." *Hage v. United States,* 51 Fed.Cl. 570, 581 (2002) ("*Hage II*") (citing Act of 1891, 43 U.S.C. § 946; Act of 1895, 43 U.S.C. § 956; and Act of 1901, 43 U.S.C. § 959). In addition, that decision observed that "[t]he Act's legislative history shows that Congress believed that Western Water and easements law generally allowed a right-of-way for 50 feet on both sides of a ditch." *Id.* (discussing the legislative history of the Mining Act of 1866 related to ditch rights-of-way).

At this stage in the case, however, it is not necessary to determine the scope of a right-of-way for the maintenance and enjoyment of a water right under New Mexico law. It is sufficient that the Complaint alleges a property interest recognized under New Mexico law that is independent of Plaintiffs' alleged surface estate rights, previously adjudicated by the United States District Court. *See Adams v. United States,* 391 F.3d 1212, 1218 (Fed.Cir.2004)(holding that dismissal for failure to state a claim under Rule 12(b)(6) is proper only when a plaintiff can prove no set of facts in support of his claim which would entitle him to relief); *see also* RCFC 12(b)(6).

### 4. The Law Of The State Of New Mexico Is Silent On Whether Forage Rights Are An Incident To Or Aspect Of Vested Water Rights Or Ditch Rights–Of–Way.

A early as 1915, the Supreme Court of New Mexico rejected the proposition that the state legislature could enact a law that created or supported private property rights in the surface estate of land in public domain equal or superior to the property rights of the federal government. *See Diamond Bar Cattle Co. v. United States,* 168 F.3d 1209, 1213 (10th Cir.1999) (discussing *Hill v. Winkler,* 21 N.M. 5, 151 P. 1014 (1915), and the effect of what is now N.M. STAT. § 19–3–13 (1978)). In fact, every similar attempt to extend the Mining Act of 1866 beyond the recognition of vested water rights and ditch rights-of-way to the recognition of private property interests, such as grazing rights, in the surface estate of federal land has been rejected. *Id.* at 1215.

An opinion authored by the Honorable Loren A. Smith, former Chief Judge of the United States Court of Federal Claims, has held that the Mining Act of 1866 protects a narrower forage right recognized as an aspect of a water right under Nevada law. *See Hage v. United States,* 42 Fed.Cl. 249, 251 (1998) ("*Hage I*") ("[I]mplicit in a vested

---

11. The Mining Act of 1866 provided that, to the extent they are recognized and "acknowledged by the local customs, laws, and court decisions," "the right-of-way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed[.]" 30 U.S.C. § 51 (2005) (R.S. § 2339 derived from Act July 26, 1866, c. 262, § 9, 14 Stat. 253).

water right based on putting water to beneficial use for livestock purposes was the appurtenant right for those livestock to graze alongside the water."); *see also Hage II*, 51 Fed.Cl. at 584 (reaffirming earlier holding regarding ditch rights-of-way and forage rights). That decision focused on the fact that the Mining Act of 1866 protects vested rights to the extent they are "recognized and acknowledged by the local customs, laws, and the decisions of courts." *Id.* at 581 (citing 43 U.S.C. § 661(1866)). In an earlier decision, Judge Smith held that under Nevada law "implicit in a vested water right based on putting water to beneficial use for livestock purposes was the appurtenant right for those livestock to graze alongside the water." *Hage I*, 42 Fed.Cl. at 251. Despite recognizing this limited forage right, the court in *Hage II* rejected the plaintiffs' broader claim that they possessed a property interest in the surface estate of the federal land at issue. *See Hage II*, 51 Fed.Cl. at 591–92.

Subsequently, the United States Court of Appeals for the Tenth Circuit, in a different case, rejected not only a claim of a possessory interest in the surface estate of federal grazing allotments, but also a separate claim under New Mexico law to a more limited forage right, similar to the limited forage right recognized in *Hage I* under Nevada law. *See Diamond Bar Cattle Co.*, 168 F.3d at 1216. In dismissing the limited forage right claim, this federal appellate court held that "it is not the law in New Mexico that a water right includes the right to graze public lands. As noted, the New Mexico Supreme Court has specifically disavowed such an interpretation of N.M. Stat. Ann. § 19–3–13. It is irrelevant to the present case that Nevada law may attach a forage right to a water right." *Id.* (citing *Hill v. Winkler*, 21 N.M. 5, 151 P. 1014, 1015 (1915)). Neither *Hill v. Winkler*, 21 N.M. 5, 151 P. 1014 (1915), nor the other cases interpreting N.M. STAT. § 19–3–13 that the United States Court of Appeals for the Tenth Circuit cited, however, address whether New Mexico law recognizes a limited forage right as incident to or an aspect of a vested water right. Rather than

supporting the federal appellate court's conclusion, the cases cited merely clarify that N.M. STAT. § 19–3–13 does not create or support a private property right in the surface estate of public land.

This court has not identified any case where the Supreme Court of New Mexico directly has addressed whether a forage right, limited or otherwise, is implicit in a vested water right or a related right-of-way. *See First State Bank of Alamogordo v. McNew*, 33 N.M. 414, 269 P. 56, 66 (1928) (recognizing a "right of way and other instrumentalities for the maintenance and enjoyment" of water rights). The United States Supreme Court, however, has advised the lower courts to seek certification where authorized, because that procedure "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). The rules of the Supreme Court of New Mexico provide for certification. *See* N.M. STAT.1978 §§ 39–7–1–13; *see also* N.M.R.App. p. 12–607 ("The Supreme Court may answer by formal written opinion questions of law certified to it by a Court of the United States.").

Therefore, in light of the importance of water rights in New Mexico, the question of whether the State of New Mexico recognizes a distinct right of forage or whether a forage right is considered to be implicit in a vested water right or related right-of-way is one that should be answered in the first instance by the Supreme Court of the State of New Mexico. Accordingly, the United States Court of Federal Claims respectfully requests that the Supreme Court of the State of New Mexico answer the following questions: [12]

1. Does the law of the State of New Mexico recognize a limited forage right implicit in a vested water right?

---

12. The court does not intend by its phrasing of these questions to restrict the Supreme Court of New Mexico's consideration of this request. The

court acknowledges that the Supreme Court of New Mexico may, at its discretion, reformulate the questions.

2. Does the law of the State of New Mexico law recognize a limited forage right implicit in a right-of-way for the maintenance and enjoyment of a vested water right?

### D. The Court's Resolution Of The Government's Pending Motion To Dismiss On Statute Of Limitation Grounds.

■ The court previously did not directly address whether Plaintiffs' Just Compensation claims were within the Tucker Act's six year statute of limitation, having dismissed those claims as barred by the doctrine of collateral estoppel. *See Walker,* 66 Fed.Cl. at 65–66. The court's resolution of Plaintiffs' Motion for Reconsideration, however, requires that the court now determine the date on which Plaintiffs' takings claims accrued. *See* 28 U.S.C. § 2501; *see also Forman v. United States,* 329 F.3d 837, 841 (Fed.Cir. 2003) ("The claim first accrues when all events have occurred that fix government liability and entitle the claimant to institute an action.") (citing *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir.1990)).

#### 1. The Government's Argument.

The Government argues that the Walkers' takings claims accrued when the U.S. Forest Service cancelled their grazing permit on November 8, 1996. *See* Gov't Mot. Dismiss 9. The Government bases that assertion on the assumption that "the triggering event upon which all claims are predicated is the cancellation of the plaintiffs' term grazing permit." *Id.* at 12 n. 8 (citing *Mitchell v. United States,* 41 Fed.Cl. 617, 624 (1998)) (holding takings claim accrued on the date plaintiff's grazing permit was canceled because water rights in California are "intertwined" with grazing permits).

#### 2. The Plaintiffs' Argument.

The Plaintiffs counter that their takings claims did not accrue when the Government cancelled their grazing permit, because they continued to use the Allotments until they legally were denied access upon the entry of the United States District Court's Final Judgment on February 27, 1998. *See* Walkers' Opp. Mot. Dismiss 9–12 (citing *United States v. Dickinson,* 331 U.S. 745, 748–49, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (holding that the situation must be "stabilized" before a takings claim can accrue)). In the alternative, the Plaintiffs argue that the accrual date is June 30, 1998. *See, e.g.,* Pl. Opp. at 1–2 ("The statute of limitations began to accrue on June 30, 1998, the date on which the [United States] District Court enjoined the Walkers ... from being able to use their state-based water rights. The injury to the Walkers occurred on June 30, 1998 and not before.").

#### 3. The Government's Motion To Dismiss Is Denied.

The United States Court of Appeals for the Federal Circuit held in *Caldwell v. United States,* 391 F.3d 1226 (Fed.Cir.2004), that: "a taking occurs when the owner is deprived of use of the property[.]" *Id.* at 1235; *see also Palazzolo v. Rhode Island,* 533 U.S. 606, 620, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (holding that a takings claim is not ripe until it is clear that the permissible use of the property is known to a reasonable degree of certainty).

The pleadings and supporting evidence in this case allege that Plaintiffs continued to utilize their alleged appropriation water rights until June 30, 1998, the last date the United States District Court permitted them to graze an average of 265 head of cattle on the Allotments. *See* Walker Decl. ¶¶ 31–32; *see also* Def. Ex. 2 (Engel Decl.) ¶ 16. Therefore, the permissible uses of the Plaintiffs' alleged water rights were not known to a reasonable degree until the United States District Court issued a final judgment on February 27, 1998. Accordingly, the court has determined that Plaintiffs' Just Compensation claims accrued no earlier than February 27, 1998. Since those claims were alleged in the Complaint filed in the United States Court of Federal Claims on February 5, 2004, the Government's Motion to Dismiss on the basis of the statute of limitations must be denied.

### CONCLUSION

For the foregoing reasons, Plaintiffs' June 17, 2005 Motion for Reconsideration is

GRANTED, in part. Certified questions of law have been issued to the Supreme Court of the State of New Mexico. The Government's May 4, 2004, Motion to Dismiss is **DENIED.**

**IT IS SO ORDERED.**